J. Leonard SPODEK, Rosalind T. Spodek, and Nationwide Postal Management, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 03–1444C.

United States Court of Federal Claims.

Sept. 8, 2006.

Robert M. Calica, Rosenberg, Calica & Birney LLP, Garden City, New York, for the plaintiffs.

Doris S. Finnerman, Trial Attorney, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, for the defendant.

## OPINION

HORN, Judge.

This case concerns a lease between the plaintiffs and the United States Postal Service (USPS) for rent on a building previously used as a post office in Abbeville, South Carolina. The plaintiffs allege breach of contract, waste, and negligence. The plaintiffs claim that the government breached the terms of the lease agreement by removing and subsequently failing to replace gutters and downspouts on the plaintiffs' building rented by the USPS, thereby causing damage to the plaintiffs' building, and by failing to pay rent for the duration of the contract. The plaintiffs also appeal from a USPS contracting officer's final decision finding that the plaintiffs breached the lease agreement by failing to keep the property in tenantable condition, as required by the terms of the lease. The government counterclaims based upon the contracting officer's final decision awarding damages as a result of plaintiff's breach of the lease agreement by failing to maintain the building in good repair and tenantable condition. A trial was held in this case, which included a site visit to the property, with the court and all parties attending.

## FINDINGS OF FACT

The property at issue, located at 100 Greenville Street, Abbeville, South Carolina, was originally the subject of a lease agreement entered into on August 22, 1966, between the USPS, as lessee, and J.C. and

Alberta Long, as lessors. The property was to be used as a post office for that community. In September, 1973, the property was transferred from J.C. and Alberta Long to the Beach Company, a real estate development company. On February 3, 1992, the plaintiff J. Leonard Spodek, acquired title to the premises and continues to be a fee owner.

The original lease had an initial term of twenty years, during which the annual rent was fixed at $8,233.00. The lease was modified in December, 1966 to provide that the government would pay taxes on the property in exchange for a reduced annual rent. This modification decreased the rent paid to $7,330.00 for the base years, going up to $8,180.00 for the years at issue in this case. The lease also provided the government with six five-year options. If all options had been exercised, the lease would have run until January 31, 2016. The government exercised the first four options under the lease, extending the lease to January 31, 2006.

Paragraph seven of the lease required the lessor to maintain the building "in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the Government's agents or employees." Paragraph 10(c) also made the plaintiffs, as lessors, responsible for returning the building to "satisfactory condition" if it became "unfit for use for the purposes leased [i.e. a postal facility]." Paragraph 10(c) further stated that "if the Lessor does not do so with reasonable diligence, the Post Office Department in its discretion may cancel the lease. For any period said building or any part thereof is unfit for the purposes leased, the rent shall be abated in proportion to the area determined by the Post Office Department to have been rendered unavailable to the Post Office Department by reason of such condition."

Ancillary to the lease was an agreement between the government and the original owner of the premises by which the original owner agreed to construct a post office facility on the premises. The building constructed is a one-story structure supported by interior steel columns and load-bearing exterior masonry walls. It measures approxi-

mately 75 feet by 100 feet, with an exterior loading dock. Because the natural grade of the property sloped downward toward the north and east end of the property, the contractor for the original owner built a retaining wall and backfilled the premises in order to level the square footage necessary to build the post office facility. At its deepest, the backfill measures approximately 13 feet deep.

The retaining wall begins near Greenville Street where the surface of the building and the surface of the adjacent property to the north are roughly on the same level. From Greenville Street, the retaining wall runs eastward approximately 142 feet to a point near the northeastern corner of the building. The section of the retaining wall closest to the building consists of concrete masonry units, except for the easternmost six feet. From the northernmost corner of the building, the wall continues eastward for approximately 110 feet, until it ends at the sidewalk on Lane Street. This second section of the retaining wall is constructed entirely from cast-in-place concrete. The retaining wall ranges in height from approximately 2 feet high to approximately 13 feet high. A slab of concrete bridges the top of the retaining wall to the exterior foundation wall of the building.

The construction, settlement of the property and repair history of the building and the retaining wall go back to 1966. Specifically, in a letter dated February 15, 1966 to C.F. Evans and Company, the USPS indicated that "excessive settlement of the rear paving areas, particularly along the North and rear retaining walls, had developed." In a second letter, dated February 28, 1966, the USPS requested that the owner of the property "[d]emolish and reconstruct the retaining walls around the rear paved area; repair damaged paving adjacent to these walls." On March 3, 1966, a portion of the retaining wall collapsed and the northwest corner of the building cracked. In a letter dated June 14, 1966, the USPS indicated that it had witnessed water leaking from the gutters onto the "front and side entrance canopies." In addition, the USPS requested "positive and complete water drainage from paved

area on north side of building," where the retaining wall was located. The retaining wall was rebuilt sometime before January, 1967.

Five years after the post office was constructed, the USPS informed the owner through a letter dated February 8, 1971, that it was witnessing sinking and cracking of the building's flooring, floor settlement and wall cracking, and a pulling away of the concrete apron from the platform sidewall. Cracking and settlement in the walls of the building was present twenty-three years later. Specifically, in an inspection report completed by the USPS on September 14, 1988, the USPS identified that "[w]alls are cracking due to settling and retaining wall has tilted [sic] two inches." On the inspection sheet, the USPS classified the work needed on the cracking walls and retaining wall as "Class B," which identified the repairs as "[w]ork necessary to prevent accelerated deterioration and/or wear of the building and building equipment."

Between 1992 and 1994, after the plaintiffs had acquired the building, the USPS and the plaintiffs were engaged in a dispute regarding repairs to the roof of the building. In a letter dated September 6, 1994, the USPS informed the plaintiffs that if the roof was not repaired, the USPS would perform the work itself and off-set the costs of the repair against future rent due under the lease. Plaintiffs hired a contractor to repair the roof; however, the work was limited, and did not address all of the areas that were leaking. Therefore, following the plaintiffs' contractor's repair work, the roof was still in generally poor condition.

Without advising the plaintiffs that the roof repairs were ineffective to seal all of the leaks in the roof, in November, 1993, the USPS retained the services of Tremco Roofing, Inc. (Tremco), to report on the roof conditions at the premises. The report prepared for the USPS by Tremco indicated that drainage on the building consisted of an "Off–Side Combination of Gutters and Interior Drains." In March, 1994, the USPS retained Powerhouse Maintenance & Construction, Inc. (Powerhouse) to replace the roof of the building. The contract between the USPS and Powerhouse, dated March 28, 1994 required Powerhouse to replace the roof and "[r]emove all gutters and downspouts from [the] entire building." The contract did not require Powerhouse to replace the gutters and downspouts they were to remove.

During the trial in this case, Ray DeMasters, the USPS Facilities Service Officer responsible for the roof replacement, testified that he concurred with the decision of Tim Houston, a USPS employee who coordinated repairs to the roof, and Tremco, not to replace the gutters and downspouts because the gutters were ineffective and they "caused more problems than they solved." Mr. DeMasters indicated that he believed that the gutters "were not an integral part of the building when it was constructed, and they caused more damage being attached to the building. So we removed those gutters from the building." The plaintiffs were not advised and did not know at the time that the gutters and downspouts had been removed and not replaced.

In August, 1994, the roof repairs had been completed and the gutters and downspouts had been removed at a cost of $30,715.50, which the USPS assessed to the plaintiffs. The USPS informed plaintiffs that it would deduct $615.31 from 50 of the USPS's future rental payments to the plaintiffs to cover the cost of the roof repairs. Subsequently, the USPS issued a final decision denying the plaintiffs' request for the cancellation of the deductions from rental payments and the return of the deducted funds. The plaintiffs, appearing *pro* se, challenged this action by the USPS at the Postal Service Board of Contract Appeals. The Board upheld the USPS's finding, but awarded the USPS only $22,047.52. *See Appeal of J. Leonard Spodek d/b/a Nationwide Postal Mgmt.*, PSBCA No. 3710, 96–2 BCA ¶ 28,457, 1996 WL 577772 (PSBCA July 25, 1996).

In September of 1997, Edwin Welch, a government contractor and president of I.L. Long Construction Company, inspected the plaintiffs' property for the USPS and identified several signs of deflection on the retaining wall. The USPS memorialized Mr. Welch's inspection in a memorandum dated September 2, 1997. In the memorandum,

the USPS indicates that "Edwin said that he took a quick look at the retaining wall on the side of the post office and said there is some sign of deflection, but not serious. It may be something that the owner will want to look at further."

More than a year after Mr. Welch's inspection, in which the USPS indicated that the problems with the retaining wall were "not serious," the USPS wrote to plaintiffs on June 12, 1998 addressing the building's retaining wall. In that letter, the USPS wrote:

In addition to the deficiencies previously identified, you are informed that serious problems exist with the area on the side of the building where the retaining [wall] was located. The concrete paving on the side of the building, which is supposed to channel water to the rear of the building, has settled as much as 3″ in some areas adjacent to the foundation wall of the building. At one time the intersections of the concrete slab and the foundation wall were caulked to prevent the intrusion of water under the slab. With the settling of the slab, the caulking is ineffective and presently water is running between the slab and the foundation wall, causing further settling, and the water is also causing damage to the large retaining wall at the side of the building.

In response to the USPS's June 12, 1998 letter, the plaintiffs responded stating that: "The lessor will live up to his obligations under the lease for the [Abbeville post office], only if permitted to do so. The Lessor is presently going out for bids to have this work accomplished." On September 9, 1998, plaintiffs received a cost proposal from Kaufman Concrete & Masonry. On September 15, 1998, the USPS sent plaintiffs a letter that referenced both the June 12, 1998 USPS letter and the plaintiffs' response of July 9, 1998. The USPS advised plaintiffs that it was unaware of any steps taken by the plaintiffs regarding the problems with the retaining wall and the subsoil drainage on the plaintiffs' property. The USPS wrote in its September 15, 1998 letter that "the water infiltrating under the broken slab was damaging the large retaining wall at the side of the building." In addition, the USPS indicated to the plaintiffs that "it has now been over ninety (90) days since you were notified of the problem and to date you have failed to repair the damaged concrete between the building and the retaining wall and water is still entering the soil under the concrete slab."

In the fall of 1998, the plaintiffs filed an insurance claim regarding the retaining wall. The plaintiffs' insurance company denied the claim and in a letter dated October 6, 1998, a construction contractor for the insurance company stated that: "Our inspection revealed that damages are the result of settling due to erosion of the earth beneath the building and lot. It is our opinion that over a period of time ground water has washed away the dirt causing the foundation to crack and settle. The retaining wall alongside the property is severely cracked and is pulling away from the pavement in the parking lot and sidewalk area beside the building."

On January 28, 1999, the USPS sent a letter to plaintiffs stating that they had failed to respond to the USPS's September 15, 1998 letter regarding the retaining wall. Also in early 1999, the USPS retained the engineering firm Arcadis Geraghty & Miller, Inc. (Arcadis) to analyze the distressed retaining wall. On March 1, 1999, Arcadis issued a report which concluded that:

The soil in the deep fill area has settled on both sides of the building foundation. There does seem to be an unusual amount of settlement that may be worsening. Rain water or ground water seepage may be washing out some of the backfill. The lack of weep holes in the north wall and the cracks in the slab above indicate that water is entering the backfill. The wall may not have been designed for this water. It is recommended that more study be done concerning the retaining wall. If the wall was not designed for increased water load in the backfill, it could fail.

In a letter to the plaintiffs dated April 1, 1999, the USPS provided the plaintiffs with a copy of the Structural Investigation conducted by Arcadis. The USPS expressed its concerns about the retaining wall and requested that the plaintiffs provide the USPS with a response to the report within 30 days.

The USPS also informed the plaintiffs that if the plaintiffs failed to resolve the structural issues, the USPS would "take action in your [plaintiffs'] behalf and proceed with the recommendations contained in the engineer's report. You will be responsible for all costs incurred by the Postal Service in conducting further investigations in your behalf." In response, on April 21, 1999, the plaintiffs sent a letter to the USPS regarding the Arcadis report. The plaintiffs advised the USPS that the plaintiffs would be "contracting with a local mason to accomplish the recommended work by your structural engineer. If the United States Postal Service elects to do any work, they do so at their own cost and expense."

In response, on April 21, 1999, the USPS questioned the plaintiffs' decision to hire a local mason, indicating that a local mason would be "ill equipped" to address the recommendations set forth in the Arcadis report. The USPS indicated that if the plaintiffs did not engage the services of a qualified engineer to conduct the additional studies recommended by Arcadis, the USPS would "proceed with the studies in your behalf, through further third party contracts." Between April 21, 1999 and June 7, 2000, plaintiffs performed no remedial measures at the Abbeville post office building site. On June 6, 2000, the USPS initiated action to begin looking for "Emergency Alternate Headquarters" and approved a request to seek the new location. In the facilities service request dated June 6, 2000, the USPS indicated that: "The existing office has an unstable foundation/floor and parking areas. Base/sub-base has washed away, creating large voids under floor, adjacent to footers and under a portion of the employee parking area."

On June 7, 2000, the day after the USPS initiated a request to seek alternate facilities, the City of Abbeville, through G. Mason Speer, Jr., a City Building Inspector, condemned the plaintiffs' building and directed the USPS to cease operations. In a letter dated June 8, 2000, Mr. Speer informed the USPS that "the building is unsafe and entering the building to remove all postal service property is done at your own risk." Mr. Speer also informed the USPS that "[t]he

operation of the postal service will no longer be allowed to operate from this building." On the same day, Mr. Speer informed the plaintiffs that their building was condemned and informed the plaintiffs that the building "must be demolished or repaired."

At the time that the plaintiffs' building was condemned, the retaining wall had failed further, in that it had moved approximately 8.5 inches away from the building, and the exterior concrete slab was cracked, was separating from the building wall and had settled approximately 3 inches. Furthermore, the interior slab had settled about 4 inches and the interior walls had settled 8 inches. On June 12, 2000, Arcadis sent a second report to the USPS addressing the settlement and condition of the plaintiffs' building. This report concluded that: "Existing conditions indicate that interior walls and floor slabs are settling due to lack of proper soil support. The reason for the loss of soil support is not known. Possible reasons may include improper soil compaction during the original construction, erosion of the soil due to leaking utility pipes, loss of soil through drains or drain fields placed along the retaining walls, or other unknown underlying soil movement or failure."

On June 22, 2000, Robertson–Wade Engineering, an engineering firm employed by the plaintiffs, inspected the plaintiffs' building and concluded that: "The primary cause for the deterioration of the facility was poor initial construction practices. The two major deficiencies were improper compaction of the fill material placed to level the site and the deficient construction of the concrete masonry wall directly behind the building. Deficient control of the storm water drainage aggravated the condition and brought the construction deficiencies to the surface."

On December 21, 2000, Hayward Baker, a foundation rehabilitation contractor, inspected the premises and reported to plaintiffs that:

We believe that the settlement of the structure results from two components. First, the building was apparently initially constructed on loosely compacted fill that was placed behind the retaining walls.... The second component of settlement was a

more dramatic occurrence. Concentrated water flow from the roof of the building flowed into the separation between the building and the slab.... This concentrated flow caused water to build up in a void under the slab (created by previous settlement) and water pressure to build up behind the wall.

Another report, dated September 10, 2000, and conducted by Engineering Consulting Services, Ltd., an engineering firm hired by the USPS stated that "the observed distress associated with the floor slab and interior walls has occurred as a result of the poor quality fills which exist beneath the structure...."

In January, 2001, plaintiffs solicited the services of Hayward Baker to stabilize the foundation of the north wall and a portion of the block retaining wall on the premises. Hayward's bid for the work was $121,500.00. Plaintiffs later retained Hayward Baker to perform a modified version of the proposed work, and by June 15, 2001, the company had completed a remedial repair. In a letter dated June 15, 2001, Hayward Baker advised the plaintiffs that: "Water seeping in between the building and exterior concrete slab is what led to the settlement problems. HBI has temporarily sealed the space between the building and concrete slab, but if the retaining wall continues to move, the slab could pull away from the wall and water could seep in again." On July 9, 2001, the City of Abbeville reinspected the premises and declared that the building was no longer unsafe for occupation.

Immediately after the condemnation was placed on the plaintiffs' premises, the USPS temporarily set up operations in the parking lot outside of the plaintiffs' property, where owners of mailboxes could retrieve their mail. Letter carriers and delivery trucks operated out of the post office in Greenwood, South Carolina. In order to locate alternate space, John Gordon, a USPS real estate specialist, contacted G. Mason Speers, Police Lieutenant Smith, Postmaster Hutchins and Ray DeMasters.

In the USPS Facilities Service Request dated June 6, 2000, the day before the building was condemned, the USPS had identified that space was available in what was previously an Ingles supermarket. On or about June 13, 2000, Ingles and the USPS entered an interim lease for space. Included in the terms of the lease was that the USPS would lease 6,500 square feet of the vacated building, which is approximately the same size as the plaintiffs' building. The term of the lease between Ingles and the USPS was for 3 years with a 60-day cancellation provision available to the USPS. The USPS was required to accept the space in "as is" condition and would be responsible for any alterations. The rent paid by the USPS for the space at the Ingles market was $8.50 per square foot, i.e., $55,250.00 per year, as compared to $8,181.00 per year for the space owned by the plaintiffs. In 2003, the USPS renegotiated its lease with Ingles, but Ingles increased the rent to $54,600.00 for the period of June 15, 2003 through June 30, 2008, and increased the rent again to $58,500.00 for the period from July 1, 2008 through June 30, 2013.

In order to perform alterations on the former supermarket to convert it into a useable post office, the USPS issued an initial work order on November 1, 2000, in the amount of $70,000.00 to I.L. Long Construction Company. At the time that this work order was placed, I.L. Long had an existing indefinite quantity contract (IQC) with USPS to provide construction services to the USPS Eastern Facilities Service Office. In July of 2000, the USPS issued a work order to Arcadis in the amount of $28,026.63, to provide all of the architectural and engineering services necessary to develop a complete set of plans and specifications for the construction of a 6,500 square foot post office within the Ingles store, and to provide architectural and engineering services during the construction.

On October 2, 2003, the USPS issued a final contracting officer's decision claiming that the plaintiffs' failure to maintain its property in good repair and tenantable condition caused the USPS to expend $680,915.52 to rebuild a new postal facility and for payment of rent on the new facility. The USPS, therefore, demanded payment from the plaintiffs in that amount.

## DISCUSSION

In order to resolve the case before the court, the court must determine what caused the deterioration of plaintiffs' building and condemnation of that building by the local Abbeville authorities. The court also must determine whether the plaintiffs breached the lease agreement by failing to maintain the property in good repair and tenantable condition, and whether the government's removal of gutters and downspouts during the renovations of the roof, and failure to replace those gutters and downspouts, caused damage to the plaintiffs' building and also breached the lease. In addition, the court must determine whether the government properly mitigated its damages when it moved out of the plaintiffs' building and chose to develop a new postal facility at the Ingles site.

The plaintiffs argue that the USPS's removal of gutters and downspouts without replacement constituted waste and a breach of the lease agreement. Specifically, the plaintiffs state that under the common law doctrine of waste, plaintiffs are entitled to damages for the costs of repairs to the retaining wall and both the interior and exterior building slabs because the damage was directly caused by the USPS when it removed the gutters and downspouts from the roof and then failed to reinstall them. The plaintiffs further argue that the original building owner did not design or construct the retaining wall to withstand pressure from concentrated water flow from the roof, but that the construction was only adequate so long as gutters and downspouts channeled the water away. The USPS's removal of the gutters and downspouts, the plaintiffs argue, created excessive hydrostatic pressure between the foundation wall and the retaining wall, exceeding that which was anticipated in the original design. The plaintiffs further state that once the gutters and downspouts were removed, failure of the retaining wall was inevitable.

In a number of places in filings submitted to the court, the plaintiffs argue in favor of applying state law. In *Forman v. United States*, the United States Court of Appeals for the Federal Circuit reviewed a lessor's claim that the USPS was in violation of a lease agreement when it sublet portions of its postal facility. *See Forman v. United States*, 767 F.2d 875, 879 (Fed.Cir.1985). In *Forman*, the lessor argued that Florida state law applied to the lease agreement. *Id.* The Federal Circuit found, however, that federal law, rather than state law, applied to the lease agreement with the USPS. *Id.* In supporting its negligence theory, the plaintiffs in the case before this court argue that the court should apply the negligence law of the state of South Carolina and attempt to distinguish this case from *Forman*, arguing that such authority "is distinguishable from the case at bar, and even if controlling, would still lead to a negligence analysis under South Carolina law." To support their position, the plaintiffs further cite to *Brooklyn Waterfront Terminal Corp. v. United States*, 117 Ct.Cl. 62, 84, 90 F.Supp. 943, 948 (1950), *cert. denied*, 340 U.S. 931, 71 S.Ct. 493, 95 L.Ed. 672 (1951), in which the court stated that: "In construing the meaning of a covenant in a lease obligating the Government as lessee to maintain the premises, the applicable law is federal, rather than State, although in the absence of federal cases in point the courts may properly turn for guidance to the general law of landlord and tenant." *See also Corman v. United States*, 26 Cl.Ct. 1011, 1016 (1992) (turning to state law to determine whether, in a holdover tenancy, the tenant is responsible for rent payments on a daily or monthly basis). As discussed more fully below, however, lease agreements similar to those in this case have been reviewed in this court numerous times and federal law has been applied.

■ Although the plaintiffs argue that the USPS is liable under the "common law doctrine of waste," an action for waste sounds in tort. *See Barren Island Marina, Inc. v. United States*, 44 Fed.Cl. 252, 255 (1999) ("[A]ssertions of waste may sound in tort . . . ."), *appeal dismissed*, 54 Fed.Appx. 329 (Fed.Cir.2003), *recons. granted* and order *vacated*, 57 Fed.Appx. 427 (Fed.Cir.2003), and *appeal dismissed*, 66 Fed.Appx. 878 (Fed. Cir.2003); *Shelden v. United States*, 19 Cl. Ct. 247, 256 (1990) ("[T]o the extent that plaintiffs allege negligent maintenance or

waste of the Moraga property, the court is without jurisdiction."), *vacated on other grounds,* 26 Cl.Ct. 375 (1992). It is well established that the Court of Federal Claims does not have jurisdiction over claims sounding in tort. *See* 28 U.S.C. § 1491(a)(1) (2000).

In their post-trial briefing, plaintiffs also analyze this case by relying on the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2674 (2000). For example, the plaintiffs cite specifically to the FTCA when they state that: "Of course, pursuant to 28 U.S.C. § 1346(b), negligence claims against the United States are governed by the law of the state in which the tort occurred." However, "Section 1346(b)(1) confers upon the district courts jurisdiction over claims against the United States sounding in tort." *Awad v. United States,* 301 F.3d 1367, 1370 n. 2 (Fed.Cir.2002); *see Jentoft v. United States,* 450 F.3d 1342, 1349 (Fed.Cir.2006) ("[I]t is clear that, to the extent Jentoft's retaliation claim 'sounds in tort,' the government has not waived its sovereign immunity in the Claims Court and that court does not have jurisdiction to hear the claim."); *Shelden v. United States,* 19 Cl.Ct. at 256 ("The Claims Court's jurisdiction does not extend to claims against the United States sounding in tort. 28 U.S.C. § 1491(a)(1). Therefore, to the extent that plaintiffs allege negligent maintenance or waste of the ... property, the court is without jurisdiction.").

The United States Court of Appeals for the Federal Circuit has recognized, however, that: "Many breaches of contract can also be treated as torts" and "where the 'tort' complained of is based entirely upon breach by the government of a promise made by it in a contract," the case does not necessarily fall under the FTCA. *Wood v. United States,* 961 F.2d 195, 198 (Fed.Cir.), *reh'g denied* (1992) (quoting *Woodbury v. United States,* 313 F.2d 291, 295 (9th Cir.1963)); *see also Fountain v. United States,* 192 Ct.Cl. 495, 498, 427 F.2d 759, 761 (1970) ("Defendant's original motion relied mainly on the allegations sounding in tort with which the petition and the papers in opposition to the motion are replete. We do not sustain the motion on this ground. If contractual relations exist, the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction. *Burtt v. United States,* 176 Ct.Cl. 310, 314 (1966)."), *cert. denied,* 404 U.S. 839, 92 S.Ct. 131, 30 L.Ed.2d 73 (1971).

Accordingly, the plaintiffs' complaint in this court for breach by the government of its obligations underlying the lease is not reviewed as one that sounds in tort, for example, under the tort doctrine of waste as the plaintiffs suggest, but instead is reviewed under the law of contracts and possible breach of contractual obligations. *See Forman v. United States,* 767 F.2d at 879 n. 4 ("[L]leases are normally considered within the realm of contracts"). Moreover, consistent with the discussion above, cases involving the rights and obligations of the United States under a contract generally are governed by federal law, not state law. The Federal Circuit has found that federal law, rather than state law, governs the interpretation of leases with the United States government. *See Forman v. United States,* 767 F.2d at 879–880; *see also Prudential Ins. Co. of Am. v. United States,* 801 F.2d 1295, 1298 (Fed.Cir.1986) ("It is well settled that contracts to which the government is a party—and though a lease may concern and convey a property interest it is also very much a contract—are normally governed by federal law, not by the law of the state where they are made or performed."), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987); *Appeal of N.J. Hastetter, Trustee for Thomas and Judith Hastetter,* PSBCA No. 3064, 92–3 BCA ¶ 25189, 1992 WL 144249 (PSBCA June 22, 1992) ("[F]ederal, not state, law is to be applied in matters related to post office leases."); *Appeal of M.R. Kaplan (Penner Fin. Group), M.b.f. Corp. (Penner Fin. Group),* PSBCA No. 1147, 87–3 BCA ¶ 19969, 1985 WL 17355 (PSBCA Sept. 9, 1985) (reviewing a lease agreement containing language the same as paragraph seven in plaintiff's case and finding that "Federal law is applicable to the determination of rights under Postal Service leases." (citing *Forman v. United States,* 767 F.2d at 875)). "Leases are not sufficiently different from other federal contracts to call for an independent set of analytical principles and rules, particularly when there is no question about

the nature of the property interest transferred, but merely a question of the lessee's obligations under the lease agreement." *Prudential Ins. Co. of Am. v. United States,* 801 F.2d at 1298 (citations omitted).

When federal law does not answer the issue presented, however, a court may look to general landlord/tenant, property and contract law principles as they are embodied in state law pronouncements for guidance. *See Brooklyn Waterfront Terminal Corp. v. United States,* 117 Ct.Cl. at 84, 90 F.Supp. at 948; *Ginsberg v. Austin,* 968 F.2d 1198, 1200 (Fed.Cir.1992) (stating that if federal law does not resolve the issue presented, a court may then consider "general property and contract law principles as they are embodied in state law pronouncements."). In the case currently before this court, as will be discussed below in detail, federal case precedent has addressed the exact lease provisions at issue in this case. Therefore, resorting to state or common law principles in this case is not appropriate.

### A. Cause of the Condemnation

In order to resolve plaintiffs' and defendant's claims, the court must determine whether the government's actions in removing and not replacing the gutters and downspouts caused damage to the plaintiffs' property by permitting water to infiltrate into the ground soils, wash away the fill and damage the plaintiffs' property to such a degree that the government's actions caused the City of Abbeville to condemn the plaintiffs' property. The court also must consider whether the settlement and condemnation of the building would have occurred whether or not the government removed the gutters and downspouts. If the government's actions in removing the gutters and downspouts caused or contributed to the settlement and condemnation of plaintiffs' building, then defendant breached the lease agreement. If, however, the settlement was caused by factors outside of the government's removal of the gutters and downspouts, such as improper initial construction or natural settlement, then the plaintiffs would be responsible for repairing the building and keeping it in tenantable condition. In that case, plaintiffs' failure to

do so breached the contract, as a result of which, the USPS was correct to find alternate operating quarters. Moreover, if settlement of the building would have occurred and caused damage to the property even without the removal of the gutters and downspouts, but removal of the gutters and downspouts contributed to or accelerated the settlement and ultimate failure of the property, then both parties may have breached the lease agreement.

One of the controlling provisions of the lease agreement is contained at paragraph seven, which states that the landlord is responsible for maintaining the premises "in good repair and tenantable condition, except in case of damage arising from the act or the negligence of the government's agents or employees." The plaintiffs argue that the damages to the premises were caused directly by the USPS's act of negligence in removing and failing to replace the gutters and downspouts on the building when it made repairs to the roof in 1994. Plaintiffs, therefore, argue that they had no legal duty under the lease to make the repairs to the premises. The plaintiffs further argue that although plaintiffs need only demonstrate that the damages at issue arose from the USPS's "mere 'act,'" the USPS's "egregious conduct also meets the stricter legal standard of negligence."

In addition to the government's duty not to damage the plaintiffs' property, paragraph nine of the parties' lease required that at the expiration or termination of the lease, the USPS would return the property in as good condition as the time that the government entered into the lease agreement. Indeed, it is the duty of a tenant to exercise ordinary care in the use of the leased property and not to cause damages over and above ordinary wear and tear. Furthermore, in every lease, unless specifically excluded expressly in the agreement, a tenant is liable to the landlord for damages unnecessarily resulting from the tenant's wrongful acts or failure to exercise proper care. *See United States v. Bostwick,* 94 U.S. 53, 65, 12 Ct.Cl. 67, 24 L.Ed. 65 (1877).

The language of paragraph seven in the lease agreement between the parties is

standard lease language that has been used by government agencies, including the USPS, repeatedly, and which has been reviewed in this federal court, its predecessor courts, and the Postal Service Board of Contract Appeals (PSBCA) numerous times. In the cases that have reviewed language identical to paragraph seven entered into by the plaintiffs and the USPS in this case, courts have found that when the government has been found liable for damage to the lessor's property, the government must pay the lessor for those damages. As this court has previously stated: "It is well-settled that, 'where there has been a breach of an obligation to restore leased premises to the original condition, a plaintiff is entitled to recover the damages it actually suffers.'" *Banisadr Bldg. Joint Venture v. United States*, 38 Fed.Cl. 392, 395 (1997) (quoting *San Nicolas v. United States*, 223 Ct.Cl. 223, 229, 617 F.2d 246, 249 (1980)). "Generally, such damages are measured by the cost of restoration." *Banisadr Bldg. Joint Venture v. United States*, 38 Fed.Cl. at 395.

Even in cases in which the specific "act or negligence" language is not included in a lease agreement, the government has been found liable for damages it caused under the duty to return property in the same condition as leased, minus ordinary wear and tear. *See Container Co. v. United States*, 116 Ct. Cl. 706, 718, 90 F.Supp. 689, 692 (1950) (finding the government liable for fire damage caused by the government's overloading of circuits in a leased building in violation of the lease agreement). Courts also have found the government liable in situations when the government, as the lessee, was required by the terms of the lease to maintain leased property in good repair and tenantable condition and the government failed to do so. *See City of New York v. United States*, 119 Ct.Cl. 769, 793, 97 F.Supp. 808, 819 (1951) ("[W]here the lease contract specifically requires the tenant to keep the premises in good repair the only obligation is to return the property in substantially the same condition as it was at the beginning of the tenancy, ordinary wear and tear excepted."); *see also Brooklyn Waterfront Terminal Corp. v. United States*, 117 Ct.Cl. at 85, 90 F.Supp. at 948.

In the case of *Poorvu v. United States*, 190 Ct.Cl. 640, 653, 420 F.2d 993, 1001 (1970), the United States Court of Claims reviewed a covenant identical to the paragraph in the parties' paragraph number seven. In *Poorvu*, as in the plaintiffs' case, the lease agreement was with the USPS and the court found that paragraph 7 "imposes no duty to repair upon the lessor [plaintiff] in this case because of the proviso that he is not responsible for repairs 'arising from the act or the negligence of the Government's agents or employees'" *Id.* at 1001. In *Poorvu*, the plaintiff leased a building to the USPS to be used as a postal facility based upon construction plans that the USPS provided to the plaintiff. After the building suffered significant settlement problems, the plaintiff brought suit alleging that the plans provided by the USPS were defective. The court found that the plans were defective because the USPS chose to delete supportive pilings underneath the parking and maneuvering area of the building. Because of the USPS's negligent actions, the court found that, pursuant to paragraph seven, the plaintiff had no duty to repair the building. *Id.* at 1001.

 By the same token, this court also has held that when a landlord fails to maintain property in good repair and tenantable condition, such failure may rise to a claim of constructive eviction and permit the government to terminate the lease. *See Richardson v. United States*, 17 Cl.Ct. 355, 357 (1989) ("The plaintiff's failure to maintain the premises ... interfered with [the government's] beneficial use of the office space and seriously impeded [the government's] ability to conduct business in a normal fashion."), *aff'd*, 895 F.2d 1421 (Fed.Cir.), *reh'g denied, suggestion* for *reh'g* en banc *declined* (1990). Although a constructive eviction claim has not been argued in this case, if the plaintiffs in this case failed to maintain the structural integrity of the premises in "good repair and tenantable condition" as required by paragraph seven of the lease agreement, the government would be within its rights to terminate the lease and seek alternate operating quarters. *See id.*

Finally, even when this court has found that the government's actions in making repairs breached a lease agreement, it still has required a plaintiff to prove that the government's actions caused damage to plaintiffs' property. *See Romala Corp. v. United States,* 20 Cl.Ct. 8, 12–13 (1990). In *Romala,* similar to what occurred in the present case, the government modified a building it was leasing, and the plaintiff, Romala Corporation, brought suit alleging that the government's modification caused damage to the plaintiff's property.

In *Romala,* the government installed a new thermostat and damper on an existing, older furnace in the building. Four years after the government installed the thermostat and damper, the furnace failed to operate. Romala brought suit alleging that the government's actions breached the lease agreement and caused the furnace to fail. *Id.* at 10. The *Romala* court found that the government's installation of the thermostat and damper "indisputably interfered with the operation of the furnace. In doing so, defendant interfered with plaintiff's duty to provide and maintain the furnace. For this reason, defendant breached the lease." *Id.* at 12. Although the *Romala* court found that the government breached the lease, the court stated that: "Defendant can only be liable here if the addition of the damper and thermostat resulted in damages. The burden of proving that falls upon plaintiff." *Id.* at 12–13 (citing *Russell & Assoc. v. United States,* 219 Ct.Cl. 663, 664, 618 F.2d 120 (1979)). Moreover, the court stated: "Plaintiff must meet its essential burden of establishing the fundamental facts of liability, causation and resultant injury." *Id.* (citing *Russell & Assoc. v. United States,* 219 Ct.Cl. at 664–65, 618 F.2d 120; *River Const. Corp. v. United States,* 159 Ct.Cl. 254, 1962 WL 9302 (1962); *G.M. Shupe Inc. v. United States,* 5 Cl.Ct. 662, 686 n. 13 (1984)). The plaintiff in *Romala,* therefore, was required to establish causation between the acts complained of, installation of the thermostat and damper, and the harm complained of, failure of the furnace. The court in *Romala,* however, found no causation between the government's actions and the failure of the furnace, and instead found that the furnace's failure was due to "aging and ordinary wear and tear." *Id.* at 13. As in *Romala,* the plaintiffs in this case must prove that the defendant's actions in removing the gutters and downspouts caused the damage to plaintiffs' building, and that it was neither the original construction nor other causes, such as natural settlement, that caused the building to be condemned and rendered untenantable.

■ The plaintiffs argue that the damages to and condemnation of the premises arose from "the act or negligence of the government's agents or employees" when the USPS removed the building's original roof drainage system, consisting of gutters and downspouts and did not replace them. The plaintiffs argue that because the USPS justifies its vacature of the building in June, 2000 upon the condemnation order issued by Mr. Speer, the City of Abbeville Building Inspector, the court must resolve whether the condemnation was attributable to damages to the premises caused by the USPS. The plaintiffs state that the trial evidence in this case is uncontradicted that the removal of the building's pre-existing roof drainage system consisting of gutters and downspouts resulted in the "sheeting" of water over the north side of the building causing significant amounts of rainwater to be diverted into the narrow area between the exterior wall of the building and the retaining wall. According to the plaintiffs, this "significant infiltration of rainwater" rapidly caused the washing out of soils beneath the exterior slab and the remaining soils to become saturated with water.

The plaintiffs argue that "all of the post condemnation engineering reports and expert testimony point to the fact that, as a direct result of the Post Office's removal of gutters and downspouts from the roof, concentrated water infiltration from a 'sheet flow' of water over the northerly wall entered under the exterior slab after every rain event, causing excessive hydrostatic pressures to build up in the space between the exterior Foundation Wall and the Retaining Wall." The plaintiffs claim that these reports include the June 12, 2000 Arcadis report. That report, however, does not conclude that the poor soil compaction was due to the flowing sheet water. In addition, plaintiffs

point to a June 14, 2000 report by Engineering Consulting Services, Ltd., a consultant to Arcadis, which indicated that "the apparent lack of a freely draining backfill and drainage media behind the walls may have allowed excess hydrostatic pressure to develop as the result of surface water infiltration." Engineering Consulting Services, Ltd., experts for the defendant, repeated this finding in a report dated September 10, 2000.

To support its argument that the condemnation of the plaintiffs' building was not caused solely by the settlement of the interior floor slabs, the plaintiffs point to the testimony of Mr. Speer, the Abbeville building inspector who condemned plaintiffs' building. During his testimony, Mr. Speer stated:

Q: [plaintiffs' counsel] Would it be correct, sir, then that in issuing the condemnation order apart from your concern about settlement of the floor in the inside of the building, you were also concerned about the hollow slab—hollow area beneath the slab outside of the building; you were concerned about hollow spaces next to the retaining wall; and you were concerned about the safety and the integrity of the retaining wall itself?

A: [Mr. Speer] Yes, sir.

Q: Did all of those factors enter into your decision to issue the condemnation order?

A: Yes, sir.

The plaintiffs allege that the damages to the building's exterior portions as a factor in the building's condemnation is best illustrated by the fact that in July, 2001, the City of Abbeville lifted the condemnation order declaring the building to be habitable and tenantable following repairs by Hayward Baker only to the exterior areas of the building, without any repair made to or beneath the interior floor slab.

The plaintiffs argue that the USPS has conceded liability for the failure of the retaining wall and the settlement of and voids under the exterior slab. Additionally, the plaintiffs argue that the USPS's act of removing the building's long standing gutter and down spout roof drainage system was solely responsible for the damage to, and the creation of the large, water-filled voids beneath the exterior slab, and that the engi-

neering testimony establishes that the failure of the retaining wall was at least equally, if not predominantly, caused by the resulting "hydrostatic pressures" on the retaining wall from the water-laden fills. According to the plaintiffs, "the only serious factual issue left for the Court to resolve is whether the substantial settlement of the Interior Floor Slab in proximity to the north foundation building wall was also the result of the introduction of massive amounts of concentrated rain water from 'sheet flow' over the north side of the building's exterior wall."

During the trial in this case, Stephen Geiger, the Vice President and principal engineer for Engineering Consulting Services, Ltd., and an expert for the defendant, testified that it was rain water washing over the building and into the ground that was washing away fill beneath the building. On June 14, 2000, Mr. Geiger had submitted a report to Arcadis, the contractor for USPS, in which Mr. Geiger concluded that: "Due to the relatively confined spaces in which the fills appear to have been placed, the fills may have been loosely placed (i.e. adequate compactive effort, excessive lift thickness, etc.)." Mr. Geiger's report indicates that the settlement of the building may have been due to loosely compacted fill and that "the retaining wall was not designed and constructed to resist the lateral earth pressures generated by the backfill." Later in his report, in addressing his conclusion as to why the retaining wall had failed, Mr. Geiger stated that: "Based upon our observations there appears to have been sufficient water flow behind the walls to allow migration of soil fines from behind the wall."

During the trial, Mr. Geiger further testified that the water was flowing over the building, entering the retained fills and creating voids beneath the concrete slab "because of the absence of drainage media and weeps." Mr. Geiger stated that there was evidence "that water has caused the movement of soils from the interior face to the exterior face [of the retaining wall]." Later in his testimony, however, when addressing the settlement of the building, Mr. Geiger stated "I don't believe water has adversely affected the interior fills, and the laboratory test data we have

does not suggest the soils are beyond their optimum moisture content to a degree that would cause that problem [the floor settlement]." Mr. Geiger also testified that in ordinary construction, one would expect settlement of a building to occur during the early years after construction, rather than in the latter years.

Brian Robinson, a witness for the defendant, who was a licensed structural engineer and owner of Robinson Wade Engineering, Inc., inspected the plaintiffs' building in 2000. He also issued a Structural Inspection Report dated June 22, 2000 and testified during the trial in this case. After his inspection of the building in 2000, Mr. Robinson stated in his report that:

> The primary cause of the deterioration of the building was poor initial construction practices. The two major deficiencies were improper compaction of the fill material placed to level the site and the deficient construction of the concrete masonry wall directly behind the building. Deficient control of the storm water drainage aggravated the condition and brought the construction deficiencies to the surface.

Mr. Robinson, therefore, concluded that the deficiencies in the building were caused by a combination of poorly compacted fill and improper drainage. Mr. Robinson testified that "the water infiltration would have been the primary cause of problems after a certain date," thus indicating that poorly compacted fill would have settled in time, but that the penetrating water would have had a secondary effect of washing away the underlying fill. The plaintiffs argue that the dates within which the infiltrating water caused the most damage to the property were between 1997 and 2000, as caused by the government's removal of gutters and downspouts in 1994.

Mr. Robinson's report is consistent with the report issued by Hayward Baker on December 21, 2000, which indicated that:

> We believe that the settlement of the structure results from two components. First the building was initially constructed on loosely compacted fill that was placed behind the retaining walls ... The second component of settlement was a more dramatic occurrence. Concentrated water flow from the roof of the building flowed into the separation between the building and the slab.

In defense to the plaintiffs' allegations that the government's failure to replace the gutters and downspouts caused the deteriorating conditions of the plaintiffs' building, the defendant argues that the settlement of the interior slab was caused by placement of improperly compacted fill soil and that the USPS was not responsible for that condition. The defendant further argues that problems with the building's foundation existed since its initial construction. Specifically, the defendant notes that on February 15, 1966, just two weeks after the lease term began, the USPS noted "excessive settlement" at the "rear paving areas," and "particularly along the North and rear retaining walls." On March 13, 1966, a portion of the retaining wall collapsed and was fixed in 1967. In June, 1966, the USPS noted uneven settlement in the parking areas around the building. In February, 1971, the USPS requested the lessor to address floor settling and wall cracks in the building. In June, 1984 the USPS noted that the building was "sinking" and in September, 1988, a USPS inspector noted that the walls of the building were "cracking due to settling."

On June 7, 2000, Mr. Speer condemned the building and barred the USPS from conducting postal operations in the building. The government relies on the condemnation as proof that the plaintiffs failed to keep their building in good repair and tenantable condition and that the untenantable condition was not caused by the USPS. Based upon the condemnation, the government argues that its counterclaim is premised upon the plaintiffs' duties set forth in paragraph seven of the lease and that plaintiffs breached their duty to maintain the building in good repair and tenantable condition.

The defendant also relies upon expert reports and testimony to argue that the untenantable condition of the building was not caused by the USPS. The defendant cites to Mr. Geiger's report and testimony in which he stated that the interior floor slab settled

as a result of poorly placed, uncontrolled fill soil containing debris, brick fragments, and decaying organic materials. In addition, the defendant relies upon the report by Hayward Baker, which stated that when they were filling in the large void between the exterior wall and the retaining wall, "a large amount of debris was excavated from the hole including building rubble, paint cans, etc." In addition, the defendant relies upon the soil tests completed by Mr. Geiger and based upon which he concluded in his September 24, 2004 report that: "Fill materials are not adequately compacted are susceptible to volumetric change as a result of their own weight and their response to the structural loadings. The resulting volumetric changes in the fill have likely caused the flow slab and interior walls of the structure to settle."

The defendant also argues that plaintiffs have failed to establish that gutters were even installed on the north side of the building, much less that they were in good repair and functioning properly. This argument fails, however, because it is contradicted by the government's own witness, Mr. Timothy Houston, a USPS environmental compliance specialist, who testified that he observed gutters on the building when he inspected the building in 1994 and that they were failing. The government further argues, however, that even if gutters were installed, whatever gutters were there did not function properly. As support for its argument, the government points to Mr. Houston's testimony in which he stated that the method by which the gutters were installed on the plaintiffs' building would not provide proper drainage into the gutters because the gutters were placed directly against the roof with no method for directing water flow into them. For this reason, Mr. Houston, on behalf of the USPS, directed Tremco to remove and not replace the gutters.

As additional support for its argument that the gutters on plaintiffs' building were ineffective, the defendant points to a 1966 USPS memorandum in which the USPS states that "the guttering has not been repaired satisfactorily. The front marquee still drips and the gutter at the north bac[k] corner still leaks." The north back corner is the corner above

the retaining wall and cement slab that was replaced. This report, which was issued only five months after the USPS took occupancy of the building, indicates that the gutters as originally installed may not have been effective to direct water away from the side of the building. This memorandum, however, does not indicate that the gutters were completely ineffective. In addition to the 1966 memorandum, the USPS also notes that the gutters were leaking in a repair and alteration inspection report issued on September 14, 1988. In that report, the USPS recommended to "repair leaking gutters on left side of building and rear exit to platform." Again, however, this report does not indicate how effective the gutters were in redirecting water, only that a portion of the gutters were leaking.

The defendant further claims that the evidence in this case establishes that the retaining wall was not properly designed or constructed and that no evidence exists that the retaining wall would not have rotated or deteriorated if there had been gutters and downspouts. The defendant argues that the condition of the retaining wall in June, 2000 was that it was structurally unsound, had moved approximately eight inches away from the building, and that the concrete slab between the building and the retaining wall had cracks, was separated from the building and had settled approximately three inches. Because the concrete slab was connected to the retaining wall with rebar, as the retaining wall deflected out, it pulled the slab with it, creating the space between the exterior slab and the building wall.

Relying on the testimony of Mr. Robertson, the defendant also argues that the retaining wall would have failed regardless of whether the gutters and downspouts were removed. Specifically, the defendant cites to the lack of weep holes in the retaining wall which would have permitted water to escape without causing hydrostatic pressure to build against the retaining wall. According to Mr. Robertson, the failure of the retaining wall may also have been due to a lack of vertical reinforcements. Mr. Robertson testified, however, that the only additional force that could have caused the wall to move was the

introduction of water sheeting into the area on the north side of the wall. Finally, the defendant points out that the fact that the retaining wall continued to deflect and the cement slab had pulled away again after Hayward Baker had made repairs to the cement slab in June, 2001 and sealed the area between the slab and the outside wall, indicates that the retaining wall would have failed regardless of whether the gutters and downspouts were removed.

From the testimony at trial and the exhibits introduced, it is established that the defendant removed and subsequently did not replace the gutters and downspouts when it conducted roof repairs in 1994. The evidence also shows that the gutters and downspouts had been attached to the building, at least as far back as 1966, when the USPS acknowledged that gutters and downspouts were attached to the building by indicating that some of them were leaking. Even if the gutters and downspouts were added to the roof shortly after the original lease agreement was signed, they appear to have been attached to and were intended to be a permanent part of the building to assist in water drainage. Moreover, the record suggests that, even if they were not functioning to completely carry water away from the building, they were performing in a drainage capacity to some extent. By removing the gutters and downspouts, and failing to replace them, the USPS failed to return the property to the same condition as it was originally furnished. The court finds, therefore, that the USPS breached the lease agreement when it removed and subsequently failed to replace the gutters and downspouts. However, this court must still determine whether that breach caused damage to plaintiffs' property. See Romala Corp. v. United States, 20 Cl.Ct. at 12–13.

After reviewing the documentary and testimonial evidence in this case, the court finds that the failure of the plaintiffs' building was caused by two factors. First, the court finds that the plaintiffs' building failed because of poor initial construction. Specifically, the evidence in this case shows that the building began to experience significant settlement early after initial construction. This early

settlement is evidence that the fill upon which the building was constructed was inadequate and poorly compacted, and there is no evidence that those defects were corrected, with the exception of some limited work on the retaining wall. The second factor that caused the building to fail was the intrusion of water between the northern exterior wall and the retaining wall. This intrusion was accelerated by the government's removal of the gutters and downspouts on the building, in particular on the north side of the building's roof. By removing the gutters and downspouts, the government removed the method intended to direct rainwater away from the building. As a result, rain water pooled on the roof until it sheeted or spilled over the north side of the building, directly into the gap between the building and the retaining wall. Although rain water naturally may have intruded this gap, the government's removal of the gutters and downspouts removed the protection intended during the construction of the building, permitting additional and unintended water to flow into the gap, contributing to washing away the underlying fill, and accelerating damage to the building. Therefore, although the government's actions caused damage to the plaintiffs' building, based on the evidence presented at trial, the court also finds that the plaintiffs breached the lease agreement by failing to prevent or repair the effects of the initial, poor construction and the continued deterioration of the building.

The fact that the plaintiffs' building was constructed on poorly compacted fill is evidenced not only by the documents presented during trial that recorded the maintenance history of the building, but also by the expert testimony presented by engineering experts for both parties. Specifically, beginning in February of 1966, the same year that the USPS entered into the original lease agreement, the government witnessed not only that the building was settling, but that the retaining wall was beginning to fail. These failures were recorded in the letter dated February 15, 1966 to C.F. Evans and Company, in which the USPS stated that "excessive settlement of the rear paving areas, particularly along the North and rear retaining walls, had developed." In a second

letter, dated February 28, 1966, the USPS requested that the owner of the property "demolish and reconstruct the retaining walls around the rear paved area" and "repair damaged paving adjacent to these walls." Furthermore, in March of 1966, portions of the retaining wall failed and required repair, which occurred in 1967. These letters, which are more than forty years old, provide evidence that the original construction of plaintiffs' building was unsatisfactory. For such significant settlement to occur so early in the building's life indicates that the building was constructed on improperly compacted fill, and the fact that the retaining wall deteriorated so quickly indicates that it also was poorly constructed originally.

Further historical evidence of the early settlement of the plaintiffs' building, and thus poor ground construction, was identified only five years after the building's initial construction in a USPS letter dated February 8, 1971. In that letter, the USPS stated that the building was settling and cracking and that the concrete platform was pulling away from the platform sidewall. Later, in 1984, the USPS submitted a Repair and Alteration Inspection Report that indicated clearly on the form that "[t]he Building is Sinking," which presumably referred to the excessive settlement of the building, and estimated that repairs would cost $10,000.00. In a second Repair and Alteration Inspection Report, dated four years later, on September 14, 1988, the USPS again indicated that "walls are cracking due to settling and retaining wall has titled [sic] two inches." Although there is no evidence that the USPS provided these reports to the plaintiffs or the predecessor owner, the reports nonetheless prove that the plaintiffs' building experienced continual settlement, starting shortly after its original construction.

In addition to the historical evidence documenting the building's poor foundation, the parties have presented the court with the testimony of several expert witnesses and engineers who conducted site inspections and drafted reports concluding that the cause of the building's settlement and the failure of the retaining wall was caused by the combined factors of poorly compacted fill and intruding ground water. For example, direct evidence that the defendant's removal of the gutters and downspouts caused water to intrude into the ground beneath the building's foundation and near the retaining wall was provided in the defendant's own engineering report by Mr. Geiger, a principal for Engineering Consulting Services, Ltd., who testified at trial. In his September 24, 2004 report prepared for the USPS, Mr. Geiger stated that:

> Roof drainage appears to be via sheet flow from the roof of the structure to the building perimeters. From the edge of the roof, water is directed to the ground surface in the immediate vicinity of the structure. ECS did not observe gutters or downspouts associated with the roof, although gutters and downspouts were present at the canopy on the west face of the building.

> In general it appears that there is positive drainage away from the building. An exception to this occurs along the northern wall of the building where a separation exists between the slab-on-grade in this area and the northern building wall. During a recent rain event, water drainage from the northern perimeter of the roof was observed to be entering the separation between the slab and the wall.

> \* \* \* \*

> The displacement of backfill placed beneath the northern masonry block retaining wall and the observed wall deflections wall also indicate that this backfill was not adequately compacted, or the wall was not designed and constructed to resist the lateral earth pressures generated by the backfill. The seepage of water into the separations between the slab and the northern building wall is aggravating this condition by increasing the weight of the soil backfill ... and has likely resulted in significant hydrostatic pressures to develop behind the wall as a result of surface water infiltration.

The defendant's own engineering reports, therefore, acknowledge that the additional intrusion of water caused by the absence of gutters and downspouts contributed to the

failure of the retaining wall and, thus, the failure of the plaintiffs' building, in addition to poor construction.

In addition to the testimony and report made by Mr. Geiger, the plaintiffs' expert, Mr. Robertson, of Robertson Wade Engineering, testified for the plaintiffs that the combination of poorly compacted fill and excessive infiltration of rain water accelerated the failure of plaintiffs' building. Specifically, in his June 21, 2000 report, made after inspecting the plaintiffs' building, Mr. Robertson stated:

> The lack of gutters and downspouts creates uncontrolled drainage. It is reasonable to assume the additional water is now discharged to the north side of the building. There are numerous seams and openings for this water to infiltrate beneath the exterior slab between the building and retaining wall. . . . The additional concentration of rain water to the north side of the building has significantly aggravated the settlement and erosion of the soils in this area as well as contributed to the deterioration of the masonry retaining wall.

\* \* \* \*

The primary cause for the deterioration of the facility was poor initial construction practices. The two major deficiencies were improper compaction of the fill material placed to level the site and the deficient construction of the concrete masonry wall directly behind the building. Deficient control of the storm water drainage aggravated the condition and brought the construction deficiencies to the surface.

Another report prepared for the plaintiffs by T.M. Mayfield, & Company on October 6, 1998, stated that: "Our inspection revealed that damages are the result of settling due to erosion of the earth beneath the building and lot. It is our opinion that over a period of time, ground water has washed away the dirt causing the foundation to crack and settle."

Finally, the engineering firm that conducted the repairs to plaintiffs' building in order to lift the condemnation order, Hayward Baker, concluded that the damage to plaintiffs' building resulted from two fundamental factors, poorly compacted fill and the infiltration of water. Specifically, in its report, Hayward Baker stated:

> We believe that the settlement of the structure results from two components. First, the building was apparently initially constructed on loosely compacted fill that was placed behind the retaining walls. . . . The second component of settlement was a more dramatic occurrence. Concentrated water flow from the roof of the building flowed into the separation between the building and the slab. . . . This concentrated flow caused water to build up in a void under the slab (created by previous settlement) and water pressure to build up behind the wall.

Based upon the trial testimony and the exhibits, including the engineering reports, presented to the court, there is a consensus among the parties' expert and engineering witnesses that the cause of the building's failure was a combination of poorly compacted fill material and the allowance of excessive drainage water into the fill soils. The court finds, therefore, that both the plaintiffs and the defendant breached the lease agreement and contributed to the damage of the plaintiffs' building.

## B. Mitigation and Apportionment of Damages

Having determined that both parties breached the lease agreement, the court must now determine the damages and costs associated with each breach and whether each party properly mitigated their damages. Although the defendant does not address whether the plaintiffs mitigated any potential damages, the plaintiffs argue that the USPS failed to mitigate its damages by electing to relocate to the new postal facility, rather than repair the leased premises, and improvidently incurred excessive resulting costs. The plaintiffs argue that they are entitled to recover the cost of making repairs necessary to lift the condemnation order, plus lost rent through the unexpired portion of the lease term under a contract theory for breach of the USPS's express obligation to return the premises to the plaintiffs in the same condition as leased. The plaintiffs further argue

that even if this court finds that the USPS did not breach the lease agreement, the defendant clearly failed to mitigate its damages by choosing to relocate to a newly constructed facility, at "prohibitive cost," rather than follow the previously established course of dealing by simply undertaking to make necessary repairs to the existing facility, which plaintiffs allege were later determined to cost no more than "$75,000–$175,000." For the reasons discussed below, the court finds that the defendant failed properly to mitigate its damages and is not entitled to recover the full cost of relocating to and constructing the new postal facility.

 It is a basic tenant of contract law that a party injured by a breach of contract has a duty to mitigate its damages. *See Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1375 (Fed.Cir.), *reh'g denied* (2005). In mitigating damages, the law requires only that the non-breaching party make "those efforts that are fair and reasonable under the circumstances." *First Heights Bank, FSB v. United States*, 422 F.3d 1311, 1316 (Fed.Cir.2005) (quoting *Home Sav. of Am., FSB v. United States*, 399 F.3d 1341, 1353 (Fed.Cir.2005)). Damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation. *See Restatement (Second) of Contracts* § 350(1) (1981). In other words, "a party cannot recover damages for loss that he could have avoided by *reasonable efforts.*" *Robinson v. United States*, 305 F.3d 1330, 1333 (Fed.Cir.2002) (emphasis in original) (quoting *Restatement (Second) of Contracts* § 350, cmt. b (1981)); *see also System Fuels Inc. v. United States*, 66 Fed.Cl. 722, 734 (2005) ("[o]nce a party has reason to know that performance by the other party will not be forthcoming ... he is expected to take steps that are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." (quoting *Restatement (Second) of Contracts* § 350 cmt. b) (omissions in original)). The doctrine of mitigation also requires that the non-breaching party act within a reasonable time after default to mitigate its damages. *See Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. 164, 166 (1990) ("All that is required is

that the government act reasonably and promptly given the circumstances.").

 The duty to mitigate applies equally to the government as well as to a contractor. As a judge of this court stated in *Ketchikan Pulp Co. v. United States:*

Plaintiff correctly points out that the government has a duty to mitigate its damages when a purchaser or seller breaches its contract with the United States. Under the doctrine of mitigation, the contractor in breach should not be charged with damages which the government could have avoided with reasonable effort and without undue risk or expense. On the other hand, the government is not required to make extraordinary efforts to ferret out the single best situation which will absolutely minimize the breaching party's damages. All that is required is that the government act reasonably and promptly given the circumstances.

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. at 166 (citations omitted); *see also Thomas Creek Lumber and Log Co. v. United States*, 36 Fed.Cl. 220, 247 (1996) (("At the same time, the government, when enforcing a damages clause, has a duty to mitigate such damages when a contractor breaches the contract between the parties.") (citing *Churchill Chem. Corp. v. United States*, 221 Ct.Cl. 284, 288, 602 F.2d 358, 361 (1979); *Engle Investors v. United States*, 21 Cl.Ct. at 549; *Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. at 166)). The government, therefore, "cannot charge the contractor for damages which could have been avoided by the government 'with reasonable effort and without undue risk or expense.'" *Id.* (quoting *Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. at 166). "Extraordinary efforts, however, 'to ferret out the single best situation which will absolutely minimize the breaching party's damages' is not required of the government." *Thomas Creek Lumber and Log Co. v. United States*, 36 Fed.Cl. at 247 (quoting *Ketchikan Pulp Co. v. United States*, 20 Cl.Ct. at 166.). Finally, it is the breaching party's burden to prove that the actions taken in mitigation were not reasonable. *See T.C. Bateson Contr. Co. v. United States*, 162 Ct.Cl. 145, 188, 319 F.2d 135, 160 (1963)

("Moreover, the burden of proof with respect to a plaintiff's asserted failure to mitigate damages rests upon the defendant [the breaching party] who asserts it.").

 To support their argument that the USPS failed to mitigate its damages when it relocated and built out a new postal facility, the plaintiffs point to the defendant's previous conduct at their site and state that the USPS had established a "years' long practice of undertaking and performing its own repairs and renovations" to the plaintiffs' building when the defendant deemed the repairs necessary and when the plaintiffs failed to make the necessary repairs. For example, the plaintiffs point out that in addition to the roof repairs undertaken in 1994, the USPS had replaced the building's entire HVAC system at a cost to the plaintiffs of approximately $10,000.00, repaved the property parking lot, replaced concrete slabs adjacent to the building, and repainted the entire building in 1997 and 1998, all at the expense of the plaintiffs. The plaintiffs argue that it was the practice of the USPS to effect the repairs and then charge the landlord once the repairs were completed. In sum, the plaintiffs state that $40,000.00 in repairs were accomplished previously by the USPS and charged to the landlord.

In addition to the USPS's earlier conduct, the plaintiffs argue that the exhibits in the record and the testimony of John Wolosick, a licensed civil engineer with the firm Hayward Baker, who testified as an expert witness for the plaintiffs, establish that the modified cost of repairing and stabilizing the building necessary to procure the lifting of the condemnation order was $75,000.00. Indeed, Mr. Wolosick testified that Hayward Baker stabilized the building in April, 2001 at a cost of only $75,000.00.

During his testimony, Mr. Wolosick stated that the concrete paving had collapsed on the north side of the building between the retaining wall and the north side of the building and that a large sink hole had been created that was approximately six to eight feet deep and three or four feet in diameter. Mr. Wolosick further stated that he was "pretty surprised to see the sink hole" and assumed that "it took a tremendous amount of water

to make that happen." Hayward Baker was able to fill the sink hole, complete the stabilization of the building, and have the condemnation order removed.

To effect removal of the condemnation order, Hayward Baker completed two reconstructive processes to the plaintiffs' building. First, Hayward Baker filled the void underneath the building using compaction grouting, which is a method of pumping dry mortar grout into the ground, which then compacts the soils in place. Hayward Baker injected more than fourteen cubic yards of grouting underneath the building to fill the void. In addition to the compaction grouting, Hayward Baker also injected foam grouting into the sink hole underneath the building. According to Mr. Wolosick, foam grouting is a "very specialty item" and a method used to fill voids in the soil using an extremely low density, but strong material. Specifically, foam grouting is cement and water mixed with a foaming agent to create a substance about a third of the weight of concrete. Hayward Baker injected foam grouting into the sink hole in addition to the compaction grouting, and, according to Mr. Wolosick, these actions were sufficient to fill the void and stem further erosion of the back fill under the retaining wall. In addition to these two processes, Hayward Baker replaced the concrete slab that lies between the retaining wall and the north side of the building.

Mr. Wolosick testified that he also recommended that the plaintiffs install tie back anchors on the retaining wall, which would have cost $12,500.00, and would have held the retaining wall in place. The plaintiffs, however, did not have this work completed and the tie back anchors were not necessary to lift the condemnation order. Mr. Wolosick further testified that since completing repairs to the retaining wall and the underlying soil, he witnessed that the cement slab had pulled away from the building approximately one to one and a half inches. In addition, he testified that he believed that the retaining wall is in a failed state, and estimated that to make repairs to the retaining wall at the time of trial would cost approximately $150,000.00. The plaintiffs conclude that the building and

the retaining wall could have been repaired in full at a maximum cost of $175,000.00.

The plaintiffs argue that given that the repairs to lift the condemnation cost only $75,000.00 and the maximum to repair the building would have been $175,000.00, the USPS had "no rational basis" for permanently relocating its operations to the vacant Ingles supermarket space, with the construction and design that cost more than $500,000.00, rather than make repairs to plaintiffs' building at a much more reasonable cost. The plaintiffs argue that because the interim lease between Ingles and the USPS permitted the USPS to terminate the lease at will, without penalty, on 60 days notice, the USPS's determination to permanently relocate to the Ingles supermarket, instead of making repairs necessary to stabilize and repair the old Abbeville Post Office and return to that site "simply cannot be justified."

The plaintiffs point out that the defendant would not have had to go to extraordinary efforts to single out the best situation because it was assisted by engineers, including geotechnical engineering specialist, and a design architect, all of whom investigated the cause of the retaining wall and building failure. Plaintiffs argue, however, that none of these experts ever investigated the cost of repairing or remedying the observed conditions. The plaintiffs point out that the Contracting Officer, John Gordon, admitted that he never had inquired into, nor was instructed to ascertain, a repair remedy or estimate for the plaintiffs' building.

In addition to arguing that the defendant failed to ascertain the costs necessary to repair the existing facility and balance them against building out a new facility, the plaintiffs argue that the price of the new Abbeville postal facility resulted from costly procurement practices. Specifically, the plaintiffs question the use of an Indefinite Quantity Contract (IQC) to complete the construction of the new postal facility at the Ingles site. In order to use an IQC contract for the construction, the USPS Contracting Officer, Chi Hung, had to request a deviation from USPS regulations that prohibit IQC contracts from being used for purchases of more than $250,000.00. In this case, on December 11, 2000, the USPS contracting officer requested a deviation permitting a purchase under the IQC contract for up to $460,000.00 for "emergency alternate quarters."

In addition to requesting a deviation from the normal cost limit of the IQC contract, the request by the USPS indicated that there was no time to competitively bid the contract. Specifically, the deviation request stated that because "this is an emergency situation, there is not time to advertise for construction." The plaintiffs argue that this contention was false. According to the plaintiffs, the USPS had ample time to competitively bid the contract and potentially achieve a lower price for the construction of the new postal facility. During the trial, Mr. Francisco Macias, a retired contracting officer for the USPS, testified that, under ordinary circumstances, when the USPS builds a new postal facility, it competitively bids for the contract. Specifically, Mr. Macias stated:

Q: [plaintiffs' attorney] Well, then let me withdraw the question. If you were building a new facility, would it be competitively bid?

A: [Mr. Macias] Absolutely.

In addition to acknowledging that the USPS would normally competitively bid for construction of a new postal facility, rather than using an IQC contract, Mr. Macias stated that the bidding process for a new facility would have taken approximately thirty days for the proposals to come back, a short time to review them, perhaps seven hours, and then a committee could have made the award. The IL Long IQC contract in this case, however, was not issued until December 18, 2000, more than two and one half months after the architectural plan for the new facility was completed on October 3, 2000. Thus, the plaintiffs argue that the defendant had 75 days available to obtain a competitively bid construction proposal.

The plaintiffs also attack the IQC contract itself, arguing that it is "rife with errors." An example of such an error exists in the list of items charged to the government by IL Long for construction of the new postal facility. Specifically, I.L. Long charged the

USPS $3,344.00 for 5,400 square feet of an item termed "Batt Insulation Unfaced." The item had a per square foot cost of $0.42. When calculated correctly, the price I.L. Long should have charged the USPS is $2,268.00. The USPS, therefore, overpaid I.L. Long in the amount of $1,076.00. In addition to this clear mathematical error, the plaintiffs argue that the price of the construction for the new building was increased by using the IQC contract, rather than by competitively bidding the contract, because in the IQC contract the USPS was charged for items that potentially would not be charged under a competitive contract. For example, in its IQC contract, I.L. Long charged the USPS $3,900.00 for rental of a 1–1/2 ton truck, $2,260.00 for rental of a dump truck, $1,350.00 for rental of a backhoe, and several other items, which the plaintiffs assert should have been charged to the contractor, not the government.

Finally, the plaintiffs argue that the amount the USPS paid in annual rent for the Ingles supermarket lease, $55,250.00 per year, approximately $8.50 per square foot, as compared to the $8,180.00 per year, approximately $1.50 per square foot, the USPS would have paid over the next 15 years under their existing lease with the plaintiffs, was "recklessly incurred." Specifically, the plaintiffs argue that the defendant was wasteful and irresponsible when it failed to seek any assistance from a real estate broker and failed to ascertain that other merchants in the same or similar spaces were paying $4.00–$6.00 per square foot, causing the USPS to pay the above market rental of approximately $8.50 per square foot. In addition, the plaintiffs allege USPS was in a poor position to negotiate its rent because it negotiated the terms of its lease in May, 2003, after it had expended more than $500,000.00 to build the postal facility in the Ingles supermarket.

As a defense to its actions, the government responds that the plaintiffs have not established that the USPS failed to mitigate its damages, that the USPS acted reasonably to mitigate its damages, and that the mitigative measures proposed by the plaintiffs were either unreasonable or founded upon specula-

tion and conjecture. Specifically, in response to the plaintiffs' argument that the USPS could have repaired plaintiffs' property instead of moving to a new facility, the government argues that this measure would have been unreasonable because it would have exposed the USPS to an undue risk of considerable loss and would have significantly compromised its interests.

In response to plaintiffs' arguments that in mitigation of damages to the building the government should have repaired plaintiffs' building, the government replies that it should not be required to deal with the plaintiffs any further, given that plaintiffs had breached the lease agreement and Mr. Spodek had proposed changes to the terms of the original contract. On August 25, 2000, after the building had been condemned, Mr. Spodek sent the USPS a letter in which he proposed to resolve the dispute between the parties without litigation. In the letter, Mr. Spodek offered three alternatives to the terms of the original lease: 1) the parties enter binding arbitration while jointly repairing the building; 2) the plaintiffs repair the building and consider expansion, subject to the parties renegotiating the lease; or, 3) the plaintiffs sell the property to the USPS in as-is condition at below market price. The defendant states that each of these alternatives represented a departure from the terms of the original lease, requiring the USPS to relinquish the rights it had under the contract. The defendant, therefore, argues that it was justified in seeking alternative arrangements that did not involve dealing with the "recalcitrant lessor."

Later, on October 26, 2000, the plaintiffs attempted to take the same approach of negotiating a resolution that included changing the terms of the parties' lease agreement. On that date, Mr. Spodek sent the USPS a letter indicating that the plaintiffs were willing to "remove the condemnation order and repair any and all safety issues in an expedient manner. The proposed work is contingent on a new lease being entered into for a fixed term at an annual rental rate of $30,000 with the owners responsible for roof and structure only." This proposal by the plaintiffs would have increased the defendant's

rent on the property approximately $22,000.00. While a significant increase, this would have been less than the approximately $500,000.00 the government spent to build a new facility. The defendant argues, however, that the only option offered to the USPS by the lessor was to deal further with plaintiffs upon terms that differed radically from those entered into in the original lease. The defendant argues that it was not required to enter into a less advantageous lease in order to protect its rights.

The government's argument is correct, and "courts have been reluctant to require parties, under the duty to mitigate, to deal further with a breaching party, especially if the breacher's alternative terms differ substantially from those of the original contract." *Koby v. United States,* 53 Fed.Cl. 493, 497 (2002). Furthermore, a non-breaching party is not required to mitigate losses by "accepting an arrangement with the breaching party made conditional on the [non-breaching party's] surrender of its rights under the repudiated contract." *Id.* at 497 (quoting *Brazos Elec. Power Coop., Inc. v. United States,* 52 Fed.Cl. 121, 129 (2002)). Therefore, the USPS was not required to enter into a resolution or lease agreement that changed the terms of their original lease.

In an August 28, 2000 letter to the plaintiffs from John Brieck, a contracting officer for the USPS, the defendant responded to the plaintiffs' requests to change the terms of the lease and stated that the USPS was not interested in jointly repairing the building. The USPS further stated to the plaintiffs: "If you intend to make the necessary repairs, the Postal Service will reoccupy the facility after the repairs are accomplished under the terms of the existing lease."

Responding to the plaintiffs' argument that the USPS had established a history of "repair and deduct," the government correctly argues that this practice, even if engaged in previously, cannot be converted into an obligation on the part of the USPS to make all repairs to a post office and then to deduct from future rents the cost of such repairs. To support its argument, the defendant cites to a General Services Board of Contract Appeal case, *David Kwok,* in which the Board

stated that a repair and deduct provision in a lease was "not intended as a remedy for a substantial and continuing breach...." *In re David Kwok,* GSBCA No. 7933, 90–1 B.C.A. ¶ 22,292, 1989 WL 112841 (GSBCA Aug. 31, 1989), *aff'd,* 918 F.2d 187 (Fed.Cir.1990). Otherwise, the defendant argues, the government would be required to give up a right it had bargained for, namely, the right to have the plaintiffs maintain the premises. Finally, the defendant argues that the plaintiffs cannot prove that the government failed to negotiate a better lease agreement at the Ingles site.

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Mich. Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed.Cir.2005), *reh'g denied* (2005) (citing *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562 (Fed.Cir.1997)); *see also Hi–Shear Tech. Corp. v. United States,* 356 F.3d 1372, 1378–79 (Fed.Cir.), *reh'g en banc declined* (2004); *Sacramento Mun. Utility Dist. v. United States,* 70 Fed.Cl. 332, 368 n. 35 (2006) ("In awarding compensatory damages, the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." (quoting *Restatement (First) of Contracts* § 329 (1932) and *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 875, 524 F.2d 707, 713 (1975))). "[T]he general principle is that all losses, however described, are recoverable." *Restatement (Second) of Contracts* § 347 cmt. c (1981). Damages for a breach of contract are recoverable when: "(1) *reasonably foreseeable* by the breaching party at the time of contracting; (2) the breach is a *substantial causal factor* in the damages; and (3) the damages are shown with *reasonable certainty.*" *Sacramento Mun. Utility Dist. v. United States,* 70 Fed.Cl. at 360 (quoting *Indiana Mich. v. United States,* 422 F.3d at 1373, and citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed.Cir.2002)) (empha-

sis in original). Thus, "[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered." *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d at 1563. Moreover, the damages must have been foreseeable at the time the parties entered the contract, which requires that they "be the natural and proximate result of the breach." *Locke v. United States*, 151 Ct.Cl. 262, 270, 283 F.2d 521, 526 (1960).

Although damages are recoverable for breach of contract, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach. *See Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed.Cir.2003) (citing *White v. Delta Constr. Int'l, Inc.*, 285 F.3d 1040, 1043 (Fed. Cir.2002)); *Christian v. United States*, 337 F.3d 1338, 1344 (Fed.Cir.), *reh'g* en *banc denied* (2003), cert. *denied*, 541 U.S. 972, 124 S.Ct. 1876, 158 L.Ed.2d 467 (2004). Thus, "courts should avoid bestowing an 'unfair windfall' on the [non-breaching party] by compensating him or her above and beyond the losses suffered under the breached agreement." *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1315 (Fed.Cir.), *reh'g* and *reh'g* en *banc denied* (2004) (citing *LaSalle Talman Bank, F.S.B. v. United States*, 317 F.3d 1363, 1371 (Fed.Cir.2003) (noting the "general principle that the non-breaching party is not entitled, through the award of damages, to achieve a position superior to the one it would reasonably have occupied had the breach not occurred.")).

Based upon the evidence provided during the trial, the court finds that the government's decision to build out a new, improved, permanent postal facility, and charge the cost to the plaintiffs, was not reasonable, especially in light of the government's breach that contributed to the failure and condemnation of the plaintiffs' building. Furthermore, to permit the USPS to recover the full cost of constructing a brand new postal facility would place the USPS in a better position than it would have been in before the breach, with a new facility and new equipment, instead of working out of the existing postal facility once it was released from the con-

demnation order. Although the plaintiffs' breach of the lease agreement in failing to maintain the facility in tenantable condition contributed to the condemnation, resulting in the need for the USPS to halt postal operations in that facility and find emergency alternate quarters, at least temporarily, the plaintiffs' breach did not allow the USPS to build out a permanent, new postal facility in the Ingles supermarket, and charge the plaintiffs for the full cost of the build out, especially since the condemnation order on the plaintiffs' property was lifted during the term of the lease.

Reviewing the costs to repair the plaintiffs' building and cause the city's condemnation order to be lifted against the costs expended by the defendant to build out the new facility, the cost spent by the plaintiffs to lift the condemnation order was $75,000.00 for the work completed by Hayward Baker, which included injecting grouting into the foundation underneath the building in order to stabilize the settlement that had occurred since the building's construction. According to the contracting officer's final decision, the cost to rebuild the new postal facility was more than $526,169.64. These amounts are strikingly different.

Although the court recognizes that the plaintiffs breached the lease with the USPS and that the USPS could not continue to operate local postal operations without a facility in Abbeville, because the USPS also breached the lease agreement, the plaintiffs are entitled to recover some, but not all, costs from the defendant for repair of the facility. The defendant was responsible under the lease agreement to effect repairs or pay an amount to account for the damages caused by the government's breach. In this case, that amount is a portion of the $75,000.00 spent to repair the plaintiffs' building, well below the $526,169.64 expended to construct an entirely new USPS facility.

The USPS began to accrue damages from the plaintiffs on the day the building was condemned by the city of Abbeville, June 7, 2000. The condemnation was not lifted until more than a year later, on July 9, 2001. During this time, the USPS was required to find alternate facilities to continue mail ser-

vice in the City of Abbeville. Initially, as testified at the trial, the USPS was conducting operations out of the parking lot of the plaintiffs' building. This situation was not feasible for an extended period in order to provide safety and security for the public, USPS personnel, equipment, and the mail. The USPS, therefore, entered into a lease agreement with the Ingles supermarket to rent space.

In its lease with the plaintiffs, the USPS had agreed to pay $8,181.00 per year, and would have paid that amount until at least 2006, when the executed lease option term with the plaintiffs expired. The government had not exercised further options to extend the lease to 2016, which would have been the end of all the available options in the lease agreement between the plaintiffs and defendant and should not be held accountable for unsigned option periods. In the lease agreement between the USPS and Robert Ingle of Ingles supermarket, the USPS agreed to pay Ingles $8.50 per square foot, or $55,250.00 per year in rent. According to a report prepared by the USPS, the average rent paid by the USPS for postal facilities in the area is $7.84 per square feet.

The USPS lease with Ingles began on June 15, 2000, just seven days after the plaintiffs' building was condemned. Although the USPS presented evidence that it searched for property comparable to plaintiffs' to begin operations, and the plaintiffs offered some evidence that rent was obtainable for approximately $4.00 per square foot at the time the USPS entered its lease and $6.00 per square foot more recently, the plaintiffs did not establish that in the short time available the USPS failed to obtain a reasonable rental amount for its temporary facility, even though the difference between the USPS's previous rent due to the plaintiffs and its rent obligation with Ingles was $47,069.00 per year in annual rent from June 2000 to June 2001, when the condemnation of plaintiffs' building was lifted. Including rent to Ingles from June, 2000 to July, 2001, the USPS expended $50,991.00 in rent before the plaintiffs' property could have been re-occupied. By the time the condemnation on plaintiffs' building was lifted, however, defen-

dant had built out another postal facility at the Ingles site.

In addition to the rent paid to occupy the Ingles supermarket facility, the defendant expended funds to build out the Ingles facility and convert it from supermarket or warehouse space into an adequate temporary postal facility. Although the USPS initiated construction on the Ingles facility by committing $110,000.00 on June 6, 2000, two days before the condemnation order was written, the condition of the plaintiffs' building at the time of the condemnation already had rendered the plaintiffs' building untenantable as a postal facility. As part of the $110,000.00, the USPS committed $24,500.00 on June 7, 2000 as "Support Funds/Emergency Alternate Qtrs." This amount, as testified to by Mr. DeMasters of the USPS was used as "part of the process of attempting to find an alternate quarters .... to do all the research, to do all the travel, to do all the background work they needed to do in order to effect finding a site." On September 22, 2000, I.L. Long, the USPS's IQC contractor submitted a construction proposal to the USPS for construction of the new facility at the Ingles site. I.L. Long's proposal was for $386,545.79. Actual construction on the Ingles facility, however, was not started until after December 12, 2000. On December 12, 2000, the USPS ordered construction, six months after the condemnation was ordered, but while the condemnation remained in effect. On this date, the USPS committed $440,827.44, which included a previous commitment of $70,000.00 for the construction of the new postal facility. On December 18, 2000, the USPS issued I.L. Long a notice to proceed with construction.

Although the USPS in this case had to vacate the plaintiffs' premises following the city's condemnation order, and working conditions prior to that time were difficult or even dangerous, it was not reasonable for the USPS to expend almost half a million dollars in building the new facility and expect the plaintiffs to reimburse the defendant for all of its expenses. The defendant operated in the alternate facility for more than six months before entering into a construction contract with I.L. Long to modify the Ingles

market into a permanent facility. Although the government may have preferred to construct a permanent, larger, newer, and more modern postal facility, even had the defendant not contributed to the conditions which led to the deterioration of the building and the condemnation of the plaintiffs' property, the defendant was not given a green light to move permanently to another facility, build it out at a cost far beyond the $75,000.00 necessary to perform repairs to plaintiffs' facility sufficient to lift the condemnation order, and charge it to plaintiffs' account. Once the condemnation order on plaintiffs' building was lifted, defendant could have resumed operations at plaintiffs' building and charged reasonable amounts to plaintiffs' account for the time out of plaintiffs' facility during the repairs and for reoccupying the plaintiffs' facility.

The court also notes that although plaintiffs sought multiple proposals to effect repair of the building, the plaintiffs made no effort to actually repair the facility until they entered into a contract with Hayward Baker on April 13, 2001, ten months after the condemnation order was issued. The work was completed by Hayward Baker on June 15, 2001, sixty days later. The building was inspected and the condemnation order lifted on July 9, 2001, after the repairs were completed. As a result, the condemnation order remained in effect for over a year from June 7, 2000 to July 9, 2001.

█ Both parties having breached the lease agreement, each party was responsible for a percentage of the cost of effecting repairs to the existing Abbeville post office. Because the court has found that both parties breached the lease agreement, an option for the court is to apportion damages relative to the liability of each party, applying a comparative negligence type analysis. See *Dynalectron Corp. v. United States*, 207 Ct. Cl. 349, 366–69, 518 F.2d 594, (1975) (Applying a " 'jury verdict' equity among the parties" in a case in which the government caused "only a share of the damage assessment because of plaintiff's contributory errors."). "It is well established that where Government-responsible and contractor-responsible causes operate jointly to create

defects, damage or injury, the costs of compensation, repair or correction will be shared by the parties. Where possible the shares will be prorated according to the degree of responsibility for the end result that each side bears." *Appeal of ACS Constr. Co.*, ASBCA No. 28488, 84–1 BCA ¶ 17179, 1984 WL 13237 (ASBCA Feb. 16, 1984) (citing *United States v. Seckinger*, 397 U.S. at 212–16, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970), which discusses comparative negligence and shared responsibility in a government contract case, and *Appeal of Bruce–Andersen, Inc.*, PSBCA No. 1000, 83–2 BCA ¶ 16,733, 1983 WL 13103 (PSBCA Aug. 5 1983)).

In this court and in the various Boards of Contract Appeals, when both parties are found to have breached a contract, damages are apportioned in accordance with the liability of each party. That apportionment, however must be made in accordance with the evidence produced by the parties. For example, in *Hargrave v. United States*, the United States Court of Claims addressed an issue similar to the issue in this case when it reviewed poorly compacted fill material. In that case, the court was asked to determine which party caused the fill material to be poorly compacted. The Court of Claims found that the government required the plaintiffs to use an excessive amount of water on certain areas to be compacted and that the extra water made compaction more difficult. The court, however, also found that the plaintiffs' compaction troubles were caused by naturally bad soil conditions, plaintiffs' inability to properly handle drainage and prevent ponding, and plaintiffs' lack of sufficient and proper equipment. *See Hargrave v. United States*, 132 Ct.Cl. 73, 81, 130 F.Supp. 598, 602 (1955).

Although the *Hargrave* court found that both parties were at fault, the evidence in that case prevented the court from being able to apportion damages. In *Hargrave*, the court stated that: "Where both parties contribute to a loss neither can recover damages unless there is in the proof a clear apportionment of the loss and the expense attributable to each party." *Hargrave v. United States*, 132 Ct.Cl. at 81, 130 F.Supp. at 603 (citing *Coath & Goss, Inc., v. United*

*States,* 101 Ct.Cl. 702, 714, 1944 WL 3694 (1944); *Newport News Shipbuilding & Dry Dock Co. v. United States,* 79 Ct.Cl. 25, 36, 1934 WL 2021 (1934)); *see also P.R. Burke Corp. v. United States,* 277 F.3d 1346, 1359 (Fed.Cir.2002) ("Where both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." (quoting *Blinderman Construction Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982), quoting *Coath & Goss v. United States,* 101 Ct.Cl. at 714–15)). "Nevertheless, if 'there is in the proof a clear apportionment of the delay and the expense attributable to each party,' then the government will be liable for its delays." *Essex Electro Engineers, Inc. v. Danzig,* 224 F.3d 1283, 1292 (Fed.Cir.2000) (quoting *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. at 714–15); *T. Brown Constructors, Inc. v. Pena,* 132 F.3d 724, 734 (Fed.Cir. 1997), *reh'g denied* (1998) ("[W]hen both parties contribute to the delay 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'" (quoting *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. at 714–15); *Utley–James, Inc. v. United States,* 14 Cl.Ct. 804, 813 (1988) ("Since plaintiff is as responsible as GSA for the GSA CPM deficiencies ... it is in a poor position to seek damages based on such deficiencies. The Board was unable to apportion the degree of blame which should be attributed to either party in this regard. Under these circumstances, no recovery can be had, in any event, by plaintiff on the CPM issue") (citing *Marshall v. United States,* 143 Ct.Cl. 51, 56, 164 F.Supp. 221, 224 (1958) ("There is no way to apportion the degree of blame which should be attributed to either party, and in these circumstances recovery cannot be allowed."), and *Hargrave v. United States,* 132 Ct.Cl. at 81, 130 F.Supp. 598)).

▮ When the parties are unable to or fail to adequately address apportionment of damages, the court may apportion damages if the evidence before it permits such apportionment. For example, in the Congressional Reference case *California Canners & Growers Association v. United States,* the court stated:

The parties have not thoroughly analyzed the nature of plaintiff's losses and the apportionment of damages. Plaintiff has asserted that all of its losses were attributable to wrongful Government action. The Government has contended that, since plaintiff was sustaining sales losses in any event, it is entitled to no recovery. In this Report, and as detailed in the findings, an attempt has been made, to the extent possible, to make such analysis.

*California Canners & Growers Assoc. v. United States,* 7 Cl.Ct. 69, 93 (1984). The Court in California Growers, therefore, apportioned damages in accordance with the evidence provided by the parties.

Similarly, in *Servidone Construction Corp. v. United States,* the court was asked to determine the cause of the plaintiff's additional expenses in completing a roadway consisting of compacted lime material. *See Servidone Constr. Corp. v. United States,* 19 Cl.Ct. 346, 367 (1990), *aff'd,* 931 F.2d 860 (Fed.Cir.1991). In *Servidone,* the court concluded that the plaintiff was entitled to recover under a differing site condition claim, but that the plaintiff contributed to the extra costs it incurred by using water with a high sulfate content which was "deleterious" to the lime operation, thus making compaction more difficult. *Id.* at 381. The *Servidone* court, therefore, apportioned damages using the jury verdict method. The court stated: "The court concludes, by way of a jury verdict, that the plaintiff may recover 90 percent of its proven additional costs associated with lime stabilization work." *Id.*

In *Servidone,* the court further stated:

[T]he plaintiff has demonstrated a Type II differing site condition with respect to the lime stabilization work. A portion of Servidone's additional expense in this connection can be attributed to oversaturation of the lime subgrade and to the quality of the water it used, however. The Government should not pay for damages to the extent of the latter contributing factor.... The court concludes, by way of a jury verdict, that the plaintiff may recover 90 percent of its proven additional costs associated with lime stabilization work.

*Servidone Construction. Corp. v. United States,* 19 Cl.Ct. at 381; *see also Dynalectron Corp. v. United States,* 207 Ct.Cl. at 368, 518 F.2d at 605 ("The Government retains its liability for issuing defective specifications.... But the Government also carries only a share of the damage assessment because of plaintiff's contributory errors .... we have differed with the Board and the trial judge and applied the precedents of this court to work 'jury verdict' equity among the parties and encourage correct contract procedures on both sides.").

Apportioning damages by way of comparative fault is also employed by the Postal Service Board of Contract Appeals (PSBCA), which, although not precedential, provides persuasive authority in reviewing USPS leases. On numerous occasions, the PSBCA has reviewed lease agreements containing language exactly the same as that listed in paragraph seven of the parties' lease agreement. For example, in the *Appeal of William Fehn,* the PSBCA stated that: "We have apportioned liability for damages to leased property between the lessor who had maintenance responsibility and Respondent [USPS] where it appeared that in addition to normal wear and tear, action by Respondent's agents or employees contributed to property damage." *Appeal of William Fehn,* PSBCA No. 2302, 89–2 BCA ¶ 21,663, 1989 WL 23179 (PSBCA Mar. 9, 1989) (citing *Appeal of Greater Eastern Holding Co.,* PSBCA No. 1128, 84–3 BCA ¶ 17,636, 1984 WL 13661 (PSBCA Sept. 25, 1984); *Ultra Constr. Co.,* VABCA No. 1873, 85–2 BCA ¶ 18,007, 1985 WL 16464 (VABCA Mar. 20, 1985); *Environmental Growth Chambers, Inc.,* ASBCA No. 25845, 83–2 BCA ¶ 16,609, 1983 WL 13142 (ASBCA June 14, 1983)). In *William Fehn,* the PSBCA reviewed the cause of a sewage blockage in a building leased by Mr. Fehn to the USPS. In that case, the Board found that the "age, wear and tear, and design of the old sewer line was the major factor in causing the damage," but that the "negligence of the [USPS's] employees was a contributing factor" in blocking the plaintiff's sewer line. *Id.* The PSBCA, therefore, apportioned damages under the lease agreement 20 percent to the government and 80 percent to the plain-

tiff. *See Appeal of William Fehn,* PSBCA No. 2302, 89–2 BCA ¶ 21,663, at 108,968.

Similarly, in *Appeal of Greater Eastern Holding Co.,* the PSBCA reviewed claims by a lessor which alleged that when the USPS made repairs to the roof of a building leased by the USPS, the government damaged the lessor's roof. The PSBCA found that in addition to normal wear and tear, the government's action "was a contributing factor to the deterioration of the eastern side of the roof...." *Greater Eastern Holding Co.,* PSBCA No. 1128, 84–3 BCA ¶ 17,636, at 87,892. The PSBCA, therefore, apportioned 40 percent of the damages to the USPS and 60 percent of the damages to the appellant. *See id.; see also Appeal of Bruce–Andersen Co., Inc.,* PSBCA No. 1000, 83–2 BCA ¶ 16733, 1983 WL 13103 (PSBCA Aug. 5, 1983) (apportioning damages for roof failure 65 percent to the government for its design defects, and 35 percent to the plaintiff for its workmanship defects).

The Federal Circuit has stated that a party is permitted some leeway in proving the amount of its damages. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery...." *Ace–Federal Reporters, Inc. v. Barram,* 226 F.3d 1329, 1333 (Fed.Cir.2000) (quoting *Locke v. United States,* 151 Ct.Cl. 262, 267, 283 F.2d 521, 524 (1960)), and (noting that the fact finding body then has a duty to "make a fair and reasonable approximation of the damages."); *Elec. and Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969) (noting that the amount of damages need not be "ascertainable with absolute exactness or mathematical precision."); *see also Indiana Michigan Power Co. v. United States,* 422 F.3d at 1373 ("While the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision[,]' recovery for speculative damages is precluded.") (quoting *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d at 1563 (citation omitted)).

The United States Court of Appeals for the Federal Circuit has recognized several methods for determining damages, including the actual cost method, the total cost method

and the jury verdict method. The actual cost method, or calculations based on actual costs to the plaintiff is preferred. *See Propellex Corp. v. Brownlee*, 342 F.3d 1335, 1338 (Fed. Cir.2003) (holding that "the preferred way for a contractor to prove increased costs is to submit actual cost data because such data provides the court, or contracting officer, with documented underlying expenses . . . ." (internal quotations omitted)). The alternative methods of calculating damages—the total cost method, and the jury verdict method—may only be used when the actual cost method is not feasible. *See Dawco Constr., Inc. v. United States*, 930 F.2d 872, 880 (Fed.Cir.1991), *overruled* on *other grounds* by *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.), *reh'g denied* (1995); *S.W. Elec. & Mfg. Corp. v. United States*, 228 Ct.Cl. 333, 351, 655 F.2d 1078, 1088–89 (1981).

In this case, although bills have been submitted for work performed and contract documents exist to determine the rents at issue, the parties have failed to establish or argue for a clear apportionment of damages based upon the mutual breach by both parties.[1] Typically, in determining damages, "[b]efore adopting the 'jury verdict method,' the court must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for a court to make a fair and reasonable approximation of damages." *Hi–Shear Tech. Corp. v. United States*, 356 F.3d at 1376 (quoting *Dawco Constr., Inc. v. United States*, 930 F.2d 872 at 880); *see also Raytheon Co. v. White*, 305 F.3d 1354, 1367 (Fed.Cir.) (finding that the "jury verdict method was not appropriate, because a more reliable method for calculating damages was available . . . ."), reh'g denied (2002).

There is no doubt that the plaintiffs' building was damaged and condemned, both parties lost the benefit of the lease agreement, and both parties incurred costs, either to repair the plaintiffs' property or to acquire alternate space. Moreover, the plaintiffs

breached the lease agreement and so did the defendant. Based upon the evidence provided to the court by the parties during the trial in this case, there is no more reliable method than the jury verdict method for apportioning and computing damages in this case. The issue is how much the government's action in removing and failing to replace the gutters and downspouts contributed to the continuing deterioration and subsequent condemnation of the plaintiffs' building. Although the correspondence, expert testimony and maintenance records presented to the court demonstrate a history of faulty construction, deterioration and settlement of the building before the USPS removed the gutters and downspouts, they do not provide an exact method of determining the percentage of existing damage up to the point that the gutters and downspouts were removed versus the percentage of damage attributable to the government after the removal of the gutters and downspouts. Based on the evidence produced at the trial, the government's actions were a contributing factor in the deterioration, late in the chronology of the history of the building, and that evidence is sufficient for the court to make a fair and reasonable approximation of damages attributable to each party using a jury verdict approach.

In the supplemental post-trial briefs requested by the court, which addressed the appropriate methodology for apportioning damages, the plaintiffs responded by again raising the argument that the government's actions in removing the gutters and downspouts constituted voluntary waste and a violation of paragraph nine of the lease agreement, for which the defendant is liable to the plaintiffs for the whole amount they claimed in their complaint. Specifically, in its brief, the plaintiffs cited to federal case law in this jurisdiction acknowledging the government's duty not to damage leased property and to return plaintiffs' property to its original condition. For example, plaintiffs cited to *Pearson v. United States*, in which the United States Court of Claims stated:

---

1. In order to join the issue, the court asked for post-trial briefing specifically on the issue of apportionment of damages, in the event that a mutual breach was established, but received only

minimal assistance, since both parties continued steadfastly to maintain that they are individually entitled to full recovery.

The plaintiffs' right of recovery in this case is limited to compensation for such damage as resulted from unauthorized use and from voluntary waste committed by the defendant, or the failure to exercise due care in the use of the property for the purposes for which it was permitted to use the same, and for reasonable rent for the use of the premises. . . .

*Pearson v. United States,* 75 Ct.Cl. 375, 380 (1932).

The plaintiffs' supplemental brief also reasserted that this court should deny the government's counterclaim in whole because "within a plain reading of the Lease covenant, plaintiffs were excused from performing *any* repairs to the Premises in accordance with the plain language of Paragraph 7 and the USPS must be held accountable for its unjustified failure to pay rent for the balance of the Lease term." (emphasis in original). The plaintiffs fail to offer any method for apportioning damages. Plaintiffs simply reassert that no apportionment is necessary and that the plaintiffs should be awarded 100 percent of their costs, consisting not only of the cost of repair to the building, but also lost rent, and that the plaintiffs should not be held liable for the costs asserted in defendant's counterclaim.

In its supplemental briefing, the defendant articulates limited suggestions for the court to apportion damages. First, however, the defendant cites *Missouri Baptist Hospital v. United States,* 213 Ct.Cl. 505, 515, 555 F.2d 290, 296 (1977) and argues that "it is not sufficient to demonstrate simply that plaintiffs incurred a cost to repair their building. Rather, plaintiffs must establish that there was diminution in market value and that such diminution exceeded the cost of repair." In *Missouri Baptist Hospital,* the United States Court of Claims stated that "when plaintiff comes to trial, he bears a dual burden. He must first of all show what the cost of restoration (in this case, cost of repair) is. Thereafter, in order to benefit by the full measure of cost of repair, plaintiff must show that the diminution in fair market value exceeds the cost of repair." *Missouri Baptist Hosp. v. United States,* 213 Ct.Cl. at 515, 555 F.2d at 296; but see *WDC West Carthage Assoc. v.*

*United States,* 324 F.3d 1359, 1362 (Fed.Cir.) (rejecting as applicable in that case the "diminution in fair market value" standard raised in *Missouri Baptist* and relying instead on the lease contract language to determine the amount of damages to which the landlord was entitled), *reh'g* and *reh'g* en *banc denied* (2003). In the case presently before the court, however, as described above, the plaintiffs' building was specifically built to house a postal facility and was condemned, thus limiting its marketability.

Although the defendant objects to the notion of apportionment as appropriate in this case, it offers that certain, limited costs could be apportioned if the court were to do so. As to the $75,000.00 plaintiffs spent to repair the retaining wall, the defendant argues that the work done by Hayward Baker was unnecessary and the repairs were completed upon a "mistaken impression" that the north exterior wall had settled. The defendant argues, therefore, that there is "no legal or factual basis for holding the Government responsible for this unnecessary repair." As found by the court above, however, the retaining wall required repair because it was weakened by water seeping into the settlement material beneath the building, partially as a result of the government's removal of the gutters and downspouts. The defendant further argues that in order to determine whether these damages should be apportioned, the court must examine the various causes that led to the deteriorating condition of the retaining wall and the void under the exterior concrete. The defendant relies on its earlier raised arguments that the damage was caused by substandard construction of the retaining wall and poorly compacted fill material in the area behind the retaining wall; that the condition was "exacerbated" by the plaintiffs' failure to maintain a water tight seal; and that plaintiffs failed to establish that the gutters and downspouts effectively diverted water away from the site when they were installed. The defendant claims that much of the work completed by the plaintiffs was unnecessary, and that Mr. Wolosick's, and hence Hayward Baker's proposal, reflects costs for unnecessary repairs. The defendant offers, however, that in the event that the court finds apportionment ap-

propriate, the only costs that could be apportioned are $12,500.00 to repair the retaining wall if it had been done in what defendant argues was a timely fashion, and $39,000.00 paid to Hayward Baker to fill the void between the retaining wall and the building with foam grout, arguing that $36,000.00 of the Hayward Baker repair was unnecessary.

Addressing the plaintiffs' claims for unpaid rent, the defendant argues that to the extent that the plaintiffs were damaged by the USPS's failure to pay rent, such damage flowed from the condemnation of plaintiffs' property and the court must determine the cause of the condemnation. The court has determined, as discussed above, that the cause of the condemnation was a combination of poorly compacted fill material as further weakened by the government's removal and subsequent failure to replace the gutters and downspouts. The government argues, however, that even if the court finds that the government bears some fault for the condemnation, plaintiffs would not be entitled to recover the amount they are seeking. Specifically, the defendant argues that the plaintiffs delayed in repairing the building in order to lift the condemnation order and that there "is no logical reason why Mr. Spodek could not have repaired the facility, had the condemnation order lifted, and advised the USPS that it could reoccupy the facility within two months of the condemnation order." The government, however, overlooks that having contributed to the condemnation and the weakening fill material, the USPS also has an obligation to compensate for the repairs necessary to lift the condemnation order. In the alternative, the government argues that if the court finds an apportionment of unpaid rent appropriate, it should limit the unpaid rent to only two months, or $1,363.50, the actual time it took to repair the building.

The court concludes that an appropriate method of apportioning damages is to review the time during which the building suffered from failed stabilization and to compare the evidence before and after the government removed the gutters and downspouts from the building. As indicated above, a record of poor construction, deteriorating conditions, and lack of maintenance on the plaintiffs'

building was documented more than forty years ago, in February of 1966, soon after construction, when the USPS witnessed that "excessive settlement of the rear paving areas, particularly along the North and rear retaining walls, had developed." During that same month, the USPS witnessed deterioration of the retaining wall around the plaintiffs' property and requested that the property owner reconstruct the retaining walls and the paving around those walls. The next month, in March of 1966, a portion of the retaining wall collapsed and the northwest corner of the building cracked. The retaining wall was rebuilt sometime before January, 1967. Four years later, in February of 1971, the USPS informed the owner that the building was undergoing significant settlement and that the building's floors were cracking. In June of 1984, the USPS indicated that the building was "sinking" and in September of 1988, a USPS inspector noted that the walls of the building were "cracking due to settling." No maintenance records were submitted to the court for the period between 1988 and 1994. The plaintiffs acquired the property in 1992 and the USPS and the plaintiffs were engaged in the dispute over the building's roof between 1992 and 1994. The government removed the gutters and downspouts in March of 1994.

This history of the plaintiffs' building indicates that the original construction, or the fill upon which the building was constructed, was of poor quality such that the building suffered from significant early settlement, which caused the retaining wall to fail within a year of construction. This history also reveals that the plaintiffs and the building's previous owners failed to resolve the settlement issues in the almost thirty years before the government removed the gutters and downspouts.

Like the maintenance records before 1994, the maintenance records for the plaintiffs' building after the gutters and downspouts were removed indicate that the building continued to deteriorate. For example, in a site report completed in 1997, the USPS indicated that its IQC contractor, I.L. Long, inspected the plaintiffs' property and indicated that the contractor took a "quick look" at the retaining wall and witnessed that there was

"some sign of deflection, but not serious." In addition, the maintenance reports submitted to the court indicate that after the gutters and downspouts were removed, the water flowing into the ground soils contributed to and accelerated the deterioration of plaintiffs' building. Also, in June, 1998, four years after the government had removed the gutters and downspouts, the USPS identified that the building had settled at least 3 inches and that "serious problems" existed with the area on the side of the building where the retaining wall is located, i.e., the north portion of the property. The USPS also observed that water was running between the concrete slab and the foundation wall, "causing further settling" and also causing further damage to the retaining wall. The gutters and downspouts that the USPS removed were located directly above the concrete slab and at least some of the water runoff that the USPS observed running between the concrete slab and the foundation wall might have been prevented by those gutters and downspouts.

Beginning in 1999, the description of damage to the plaintiffs' building was provided by the many contractors who the plaintiffs and defendant had hired to provide reports on the cause of damage to plaintiffs' building. These reports are discussed in depth above and indicate that the cause of the building's failure was a combination of poorly compacted fill material and excessive seepage of water into that material. The first such report, dated March 1, 1999, was completed by Arcadis, Geraghty and Miller at the request of the USPS, and quantifies the settlement and area on top of the retaining wall by stating that the "slab at the building has settled about 3″ since the patch and about 4½″ since original construction." The report also indicates that the "slab has translated about 1″ from the building." Moreover, the report indicates that Arcadis pushed a one-half inch diameter rod through the crack and 48 inches into the soil, indicating that at least the first 4 feet of fill material was poorly compacted or had washed away. On the interior of the building, Arcadis identified that the floor in one storage room had settled up to 2 inches. The reports from the USPS and its engineers suggest, therefore, that

from 1997 to 1999, the condition of the retaining wall and plaintiffs' building went from "nothing serious" to "an unusual amount of settlement that may be worsening."

After reviewing the maintenance records and engineering testimony in this case, the court finds that the defendant's removal of gutters and downspouts was a contributing factor to the failure of the plaintiffs' building, albeit a chronologically later and secondary one. According to the record before the court, plaintiffs' building was poorly constructed in 1966 and only limited repair and maintenance work was accomplished to address the identified problems. Even the gutters, according to the evidence, were not functioning completely properly shortly after initial construction in 1966, and were not maintained to function properly during subsequent years. After almost thirty years, the defendant removed the gutters and downspouts at issue. Although the removal of the gutters and downspouts contributed further to an already deteriorating facility, the building, which was condemned in 2000, may have been found unsuitable for use as a postal facility even absent the condemnation due to increasingly difficult conditions in the building. Based upon the evidence discussed above and having determined that both parties breached the lease agreement, the court apportions damages using the jury method according to the liability of each party, including the plaintiffs' failure to maintain or repair the premises over the years and the defendant's removal of the gutters and downspouts without replacement. Although Mr. Spodek claims that he had hired a local individual to watch his building, both before and after the gutters and downspouts were removed, the building was allowed to continue to deteriorate without attention to necessary repairs during all of plaintiffs' ownership of the property. In sum, he and the other plaintiffs knew or should have known of the condition of the building. Although defendant's actions contributed to the deterioration of the building, it was primarily plaintiffs' responsibility pursuant to paragraph seven of the lease to maintain the building "in good repair and tenantable condition" and make necessary repairs to the deteriorating

building, caused initially by poor construction. Therefore, after hearing and reviewing all the evidence produced at trial, the court finds that the defendant's actions in removing the gutters and downspouts accelerated the damage to the building and contributed 20 percent to the building's failure. The plaintiffs' failure to repair construction defects and to maintain and repair the premises accounted for 80 percent of the building's failure, leading to the untenantable condition and ultimate condemnation.

In this case, the parties presented the court with the costs for each side following the condemnation of the plaintiffs' building. This amount included the costs to the plaintiffs for repairing their building in order to lift the condemnation order and the plaintiffs' lost rent during the time their building was condemned. Specifically, the plaintiffs' costs expended to lift the condemnation order was $75,000.00 paid to Hayward Baker, for injecting grouting under the plaintiffs' building in order to stabilize the foundation. Those repairs took 60 days to complete. Although the defendant argues that part of this cost was for unnecessary work, there was insufficient evidence presented at trial to document defendant's allegation.

In their post-trial brief, the plaintiffs also request $4,643.00 in rent for the balance of the period remaining in the lease when the building was condemned and the defendant vacated the premises. Although the plaintiffs claim in their filings that the parties were in lease option period 5, after reviewing the lease agreement and the parties' stipulation of facts, the court finds that the parties were actually in option period 3 when the condemnation order was imposed, although option period 4 had been executed by the government. The plaintiffs also request $40,905.00 "for all of option period 6." [2] The plaintiffs are not entitled to receive rent for the option years that the government did not exercise, i.e., option periods 5 and 6. Nor are the plaintiffs entitled to receive rent for any period during which the building was condemned and not repaired. To the detriment of both parties, the plaintiffs moved slowly and delayed almost a year before making the necessary repairs by entering into a contract with Hayward Baker. Once the plaintiffs entered into a contract with Hayward Baker, the repairs were accomplished and the condemnation order was lifted in approximately two months. Had the plaintiffs expedited repairs to their property, the USPS might have been able to reoccupy the facility in two months. Additionally, the record in this case shows that after the condemnation order was lifted, the plaintiffs made no efforts to mitigate their damages and acquire another tenant. For this reason, and because the plaintiffs materially breached the lease by failing to maintain the property in tenantable condition, the plaintiffs are not entitled to recover lost rent during the period the building was condemned or for the remainder of the third or fourth executed option periods. Based on the apportionment found appropriate by the court, the plaintiffs, therefore, are entitled to recover only 20 percent of the $75,000.00 it paid Hayward Baker to repair the building. This amount equals $15,000.00. The plaintiffs' total recovery on its complaint, therefore, is $15,000.00, plus Contract Disputes Act interest.

In the plaintiffs' amended complaint, the plaintiffs request several amounts in addition to rent and the costs expended to Hayward Baker. During the trial in this case, however, the plaintiffs provided insufficient support for those additional claims in order to attribute those costs to the defendant. They include: "Additional Work," claimed at $34,000.00; "Replace Gutters," claimed at $5,000.00; "Miscellaneous Repair and Resto-

---

**2.** The plaintiffs' claims for rent are inconsistent between their complaint and their post-trial briefs regarding the dollar amounts and the unexpired time in exercised option 3 (February 1, 1996 through January 31, 2001), and exercised option 4 (February 1, 2001 through January 31, 2006), as well as their claims for the unexercised option 5 (February 1, 2006 through January 31, 2011), and unexercised option 6 (February 1, 2011 through January 31, 2016). For example, the plaintiffs' amended complaint requests rent totaling $7,241.43, accumulated as of June 6, 2002, which does not correspond to any option time period, but perhaps is related to the plaintiffs' June 5, 2002 claim to the contracting officer. In their post-trial brief, the plaintiffs request a total amount of $45,548.00 for rent for option periods 5 and 6, which began on February 1, 2006, neither of which option the government had exercised.

ration," claimed at $30,000.00; "Robertson Wade—Site Inspection Report," claimed at $800.00; "Postage and Delivery," claimed at $118.30; and "Copying Costs—Blueprints," claimed at $29.63. As for the "Additional Work" and "Miscellaneous Repair and Restoration" claims, the plaintiffs have failed to provide any specificity to these otherwise general allegations. Similarly, the plaintiffs have failed to provide evidence of any of its additional costs, including replacing the gutters and downspouts on plaintiffs' building. Indeed, during the site visit in this case, the court observed that the plaintiffs still had not replaced the gutters and downspouts on their building. For these reasons, other than the apportioned costs expended for Hayward Baker to repair the building, the plaintiffs' unsubstantiated claims listed in its amended complaint are denied.

Turning to the defendant's damages, during the time the condemnation order was in effect for one year and one month, the government expended costs to find alternate quarters, paid rent at those alternate quarters and made repairs necessary to secure and distribute the mail and establish a temporary facility in order to continue operation of a postal facility in Abbeville. The records and bills provided to the court demonstrate that once the condemnation order was imposed, the USPS expended $24,000.00 in initial costs to find alternate quarters. The USPS found alternate quarters at the Ingles supermarket facility. The USPS then expended $70,000.00 to initially and temporarily secure the facility by installing security walls, securing the front entrance, cleaning the facility, and turning it into a temporary post office. Although the plaintiffs allege inflation in all of defendant's numbers, no substantiated objections to the $24,000.00 and $70,000.00 figures were offered by the plaintiffs. These amounts total $94,000.00, and the USPS is entitled to recover a portion of the initial costs, as they were reasonably anticipated in the event of a breach by the plaintiffs. However, because the defendant contributed to the building's deterioration and ultimate condemnation, the defendant may recoup only 80 percent of its initial costs, or $75,200.00. The USPS is not entitled to recover its additional construction costs to build out a permanent, modern postal facility in the Ingles supermarket. To grant the government's request for those additional construction costs would unjustly bestow upon the USPS a windfall by providing the USPS with a new facility at the plaintiffs' expense.

The difference in rent expended by the USPS is the $55,250.00 per year spent at the Ingles facility minus the $8,181.00 per year it would have spent at the plaintiffs' property. This amount equals a $47,069.00 increase in rent per year, or $3,922.00 per month. Because the plaintiffs delayed in effecting repairs to its property, the condemnation order was in place for one year and one month. After the condemnation order was lifted, the USPS could have reoccupied the plaintiffs' property, which had been stabilized by the plaintiffs and would have occasioned a much lower cost than remaining at the Ingles facility. In the time that the condemnation order was in place, however, the USPS was required to expend $50,991.00 in additional rent ($47,069.00 for the year, plus $3,922.00 for the extra month). The total amount expended by the USPS to operate at a relocated facility during the period of the condemnation, therefore, was $144,991.00 ($94,000.00 to find and modify the new facility, plus $50,991.00 for additional rent). However, because the defendant contributed to the deterioration and ultimate condemnation of the plaintiffs' building, the defendant is entitled to recoup only 80 percent of these costs, or $115,992.00.

## CONCLUSION

For the reasons discussed above, the court finds that the plaintiffs breached the lease agreement by failing to maintain their premises in good repair and tenantable condition. Based upon the plaintiffs' breach, the defendant is entitled to recover $115,992.00, plus interest, on its counterclaim for costs expended in finding an alternate facility, paying rent on that facility and remodeling as necessary to turn the facility into a secure and functioning post office. The court also finds that the defendant breached the lease agreement by failing to replace the gutters and downspouts, which contributed to the failure of plaintiffs' property. Plaintiffs' recovery on

defendant's breach is $15,000.00, plus Contract Disputes Act interest, which represents defendant's portion of the costs necessary to lift the condemnation order. Within twenty days of the issuance of this opinion, the parties shall submit a joint statement of final damages consistent with the opinion so that the court can enter final judgment in the case.

**IT IS SO ORDERED.**